EASTERN DIST.
June, 1840.

DEVALL
vs.
CHOPPIN ET AL.

---

DEVALL *vs.* CHOPPIN ET AL.

APPEAL FROM THE COURT OF THE FOURTH DISTRICT, FOR THE PARISH OF
POINTE COUPEE, JUDGE NICHOLS, OF THE SECOND DISTRICT, PRESIDING.

An act of sale passed before the commandant of Point Coupée, in 1774, in presence of two witnesses, wherein it is stated that the *vendor did not sign it, because he did not know how to write* ; but it is mentioned that the title was delivered to the vendee, who took immediate possession of the land, possesses the requisites *of an authentic act,* under the Spanish law.

*Parole* sales of immoveables have been repeatedly recognized under the Spanish law ; and at that remote period, the *ordinary mark* of a party to an authentic act was not required.

*Parole* evidence is good to prove facts and circumstances of possession at a time when plaintiff's title was unknown, and when the parties could not be suspected of making evidence for themselves.

The acts and authority of a commandant, putting a settler in possession of a part of the public domain, by a written permission or grant, showing the extent of the tract conceded, and accompanied by proof of occupancy, will be considered *prima facie,* a good and sufficient title. The acts of an officer to whom a public duty has been assigned, are *prima facie,* taken to be within his power and authority.

It is historically known that the Spanish government never contested the validity of grants made by the French officers before the Spaniards took possession of the colony of Louisiana in 1769.

The possession of an usurper, or person under a defective *mesne* conveyance and who is evicted, will not interrupt prescription, as against the rightful proprietor, when they both claim under the same original title.

Where the original possessor was in good faith, although an intermediate possessor of the premises held in bad faith, the subsequent possessor in good faith can avail himself of the prescription applicable to such possession.

If the possession has commenced *in good faith*, and if it is afterwards held in bad faith, that will not prevent prescription, even if the possessor's title was fraudulent, and he knew another person had a better title.

To support the long prescription of thirty years, *possession* only, without title or good faith, is necessary : but continuous and uninterrupted possession, under a legal title derived from the original grantee, with certainty in the object and good faith in the first and subsequent possessors, will support the prescription of ten years.

Where the possession has not always been *a corporeal one*, but when it is necessary to complete a possession already begun, the *civil possession* will suffice.

This is a petitory action. The plaintiff alleges that he is the owner of a tract of land situated in the parish of West Baton Rouge, on the west bank of the Mississippi, having forty arpents in front, by the depth of forty, which he purchased from the heirs of Wm. Conway, deceased ; that said tract of land was originally granted, in three different portions, to said Conway and his two uncles, by the Spanish Government, who afterwards acquired all their right, title and interest in the same.

The plaintiff further shows that the defendant, C. A. Choppin, E. G. Collinsworth, B. F. Joy, and C. Blackman, illegally took possession, and claim to be owners of said tract of land, and continue to withhold the same from him. He prays for judgment, condemning the defendants to deliver up the premises to him, and for rents, profits, and damages; and that they be restrained from cutting down any more timber on the land, and from removing that already cut.

The defendants severed in their answers. Choppin admitted he was owner and in possession of a portion of the premises, under a title derived from Catherine Herbert, and ate wife of François Bidou, who inherited from her brother Joseph Herbert, and that he bought it from Pierre Perrault,

to whom it had been granted by the French government in 1767 ; and that these parties and those under whom they claim have had the uninterrupted possession in good faith ever since the original grant.

The defendants, Collinsworth and Joy, pleaded à general denial ; they denied the plaintiff's right and title and specially averred that they and those under whom they claim, had been long in the uninterrupted possession of the land claimed by them as owners, under a good and legal title. They adopt the answer of their co-defendant, Choppin, and plead the prescription of ten, twenty and thirty years.

These pleadings formed the principal issues in the case.

Both parties claim title under authority of the colonial governments of Louisiana. The plaintiff sets up title under the three Conways, granted by the Spanish government in 1786, as purchaser from their heirs and descendants, by public act dated the 11th November, 1835.

The defendants derive title from an order of the commandant of Point Coupée, made on the *requête* of Perrault, the 9th February, 1767 ; the commandant then being a French officer, acting under the orders of the French government. Perrault was put in possession ; and after making some improvements on the land, he, on the 19th April, 1774, sold and conveyed all his right and title to François Herbert. Herbert died insane, and his sister, Madame Bidou, became the owner. Bidou sold, to one Mathurin, the 14th May, 1807. This sale was afterwards set aside, and reverted to the widow, and was, ultimately, at the suit of her agent, Baudin, (at least thirty-two arpents front,) and bought by him at sheriff's sale. There were various other sales and transfers of the *locus in quo,* before it passed into the possession of the present defendants, which are fully set forth and explained in the opinion of this court, and need not be recapitulated.

The district judge, on hearing the case and the evidence adduced by the parties, pronounced judgment in the following brief manner :

" Both parties claim the land under Spanish titles, which were exhibited on the trial.    The court is relieved from pronouncing upon the relative strength of these titles, by the plea of prescription set up by the defendants.    In addition to their written title, they have established an uninterrupted possession in themselves and their authors, sufficient to justify a decree in their favor."  Judgment was given for the defendants, and the plaintiff appealed.

*R. N.* and *A. N. Ogden*, for the plaintiff, argued to show that the plaintiff had proved a good and complete title to the land in question, which could not be defeated by the defendant's title and adverse possession.    The plaintiff's was complete and perfect, so as to entitle him to a recovery in the petitory action on the strength of his title.

2.  The defendant's title was defective from its inception to the end of the chain under which the defendants claim.  Their continuous possession has been interrupted, and so much broken as to prevent prescription.    There is interruption during the possession of Mathurin and Baudin, from 1807 to 1814, which renders it impossible for the defendants to connect their possession, and that of their immediate authors, with the original title.    This does away with the *long prescription ;* and the titles are too imperfect to support the short prescription of ten and twenty years.    On the strength of titles, the plaintiff must recover.

*L. Janin*, for the defendants, Choppin and others, argued to show that they had shown a connected and complete chain of title from the year 1767 down to the present defendants, which, coupled with a continuous adverse possession, would support all the prescriptions pleaded.    The defendants have shown a good title, with continued and constant possession for more than half a century, and cannot be disturbed in their property and possession.

*Elam*, for Joy and Collingsworth, insisted that the plea of prescription must prevail.    It was fully established by the

EASTERN DIST.
*June*, 1840.

DEVALL
*vs.*
CHOPPIN ET AL.

evidence, and there is no adverse possession shown to interrupt it. It requires one year's adverse possession to interrupt prescription. Old *Civil Code, page 484, article* 51 ; *Louisiana Code*, 2483, 3405, 3406, 3407.

2. The plaintiff, having dismissed so much of his demand as embraces the claim of Patrick Conway, failed to show that Joy and Collingsworth were included in the survey of either of the other two Conways. The *locus in quo* is not proved separate from the part abandoned ; so that the plaintiff cannot recover as to these defendants.

*Roselius*, for the plaintiff, insisted in argument that a good and complete title having been made out, the plaintiff must recover upon the strength of his title ; that the facts and broken title of the defendants, even coupled with their possession, is not sufficient to enable them to hold out against the plaintiff's good and perfect title.

*Simon J.*, delivered the opinion of the court.

This is a petitory action. Plaintiff alleges that he is the owner of a tract of land situated in the parish of West Baton Rouge, on the west bank of the Mississippi, containing forty arpents in front, more or less, by the depth of forty arpents, bounded above by *Fausse-Rivière*, which he purchased from the heirs of William Conway; that the titles to said land were originally granted in three portions, by the Spanish government, to William Conway, Patrick Conway, and Maurice Conway ; that afterwards, William Conway acquired the title of his two uncles to their respective portions, died the sole and exclusive owner of the three tracts, and transmitted the same to his heirs, who sold to the petitioner. He prays that the defendants, who are in possession of the whole land, be condemned to deliver up the same to him, and to pay him fifteen thousand dollars for the rents and profits, and ten thousand dollars damages.

The defendants, after pleading the general issue and denying specially the heirship of plaintiff's vendors, aver that they are in possession of certain portions of the tract of land claim-

ed by plaintiff, which they purchased from the succession of
Alexander Baudin, in April, 1836, as designated on, and
according to a sketch annexed to the probate sale of the
lands of the said succession; that the purchasers of the tract
sold by the estate of Baudin, derive their title, by regular
intermediate conveyances, from Catherine Herbert, widow
Bidou, who had inherited the same from her brother, Joseph
Herbert, who had acquired it from Pierre Perrault, to whom
it had been granted by the proper authorities. The defend-
ants further allege a peaceable and uninterrupted possession,
in good faith, and with a just title, since 1767, and plead the
prescriptions of ten, twenty and thirty years.

Before the trial in the court below, plaintiff dismissed that
part of his claim under Patrick Conway, and limited his de-
mand to thirty arpents in front, by forty in depth, under
William and Maurice Conway.

The record shows that plaintiff's titles to the thirty arpents,
are predicated on a complete grant made by the Spanish
government to William Conway, on the 1st February, 1786,
for ten arpents in front, by forty in depth, situated in the dis-
trict of Pointe Coupée, bounded on one side by Patrick Con-
way, and on the other by Maurice Conway; and on an
order of survey issued on the 27th January, 1789, in favor
of Maurice Conway, for twenty arpents in front, by forty in
depth, situated in the district of Pointe Coupée, in the infe-
rior part of the mouth of False River, and bounded on one
side by the mouth of said False River, and on the other by
the tract of William Conway. Both titles were regularly
confirmed by an act of congress of the 28th of February,
1823, and are accompanied by plats of survey made under
the Spanish government, showing their location. It further
appears that Maurice Conway, by last testament, dated 22d
of May, 1792, instituted his nephew, Wilson Conway, as his
only and universal heir; and that the children of William
Conway, after the death of their ancestor, sold the two
tracts to plaintiff, on the 11th of November, 1835. The
plaintiff relying wholly on his titles, has produced no proof
of possession in himself, nor in any one of those under whom
he claims.

EASTERN DIST.
June, 1840.
⎯⎯⎯⎯⎯⎯
DEVALL
vs.
CHOPPIN ET AL.

On the part of defendants, it has been shown that on the 9th of February, 1767, Pierre Perrault petitioned the French government of Pointe Coupée, for a tract of land on the point of False River, to contain forty arpents in front, by such depth as might be found; which was granted "*sous le bon plaisir de Monsieur le gouverneur*," with certain conditions and restrictions. This title, after having been once rejected by the United States land commissioners, when claimed in the name of Philip Bidou, was afterwards regularly confirmed in the name of Alexander Baudin, for forty arpents in front, by forty in depth, by act of congress of the 28th of February, 1823.

From the mass of evidence contained in the record, we have deemed it necessary, in order to understand the chain of titles under which the defendants pretend to possess, and particularly for the investigation of the question of prescription, to recapitulate the following facts: Perrault, in 1774, sold his land to Joseph Herbert; and so far, there is no proof of actual possession by Perrault, except that it appears from the sale, that he had cut down and hewed timber on the land. Herbert, who was in the lumber trade, cultivated the land, made pickets, and cut cypress timber on it. He became insane in 1776, a curator was appointed to him, and he died some considerable time afterwards. During his insanity, the land was left unoccupied; and for aught we know, it must have been during this period that the Conways made their application to the Spanish government. Herbert left no other heir but his sister Catherine, who was the wife of François Bidou, and resided in France. No further act of actual possession is shown until 1807; that a son of Mrs. Bidou came to Louisiana, and sold the land to Mathurin, under the pretence of having inherited the same from his uncle Herbert. Mathurin took possession of the land, and possessed it for several years; but already in 1806, Madame Bidou had sent her power of attorney to Baudin, who, in 1812, instituted a petitory action against him in the United States Court, based on the same titles relied on in this suit by defendants. Mathurin was evicted, and Baudin, in 1813,

was put in possession of the tract, as agent of Mrs. Bidou. In March, 1814, Baudin, as agent, sold a part of the land to Guinault; and in July following, Baudin became the purchaser of the balance at sheriff's sale; he took up his residence on the land with his family in 1815, and was there in 1816. In 1820, Guinault sold his part of the tract to Baudin, who, in 1821, had the whole of it surveyed by one L'Hermite; this witness found several persons living on it, with Baudin's permission. In 1822, one Brugé lived on the land; he had purchased a portion of it from Baudin, who, after his death, bought it back at probate sale. In 1833, Baudin sold the whole tract to Brunet, who took immediate possession, cultivated the land, made four crops, and remained there until the latter part of 1827, when, having failed, the tract was sold by his syndic, and bought in again by Baudin. After the death of Baudin, in 1834, the land was sold in five portions to several persons, who, together with their vendees, are the defendants in this suit.

The evidence shows, also, that in 1819, Baudin instituted a suit against Dubourg and Baron, agents of Mrs. Bidou, on an account of expenses incurred during his agency, in which he gives credit for the amount of the sales . made by him to Guinault, and by the sheriff to himself, claiming judgment for the balance. He recovered; and an appeal having been taken to this court, the judgment was affirmed, and the matters of controversy resulting from Baudin's agency, were thereby ended. It is further in evidence that Baudin, styling himself the attorney in fact of the heirs of Patrick Conway, made application to the land office for the confirmation of their title; and although the identity of the individual has been very much controverted, we are satisfied that he is the same Alexander Baudin who obtained the confirmation of the title of Perrault. Proof has also been adduced, to show that Baudin paid the taxes on the land in dispute, from 1814 to 1834.

The record contains several bills of exceptions, one of which it is only necessary to notice: plaintiff objected to the production of a copy of the act of sale from Perrault to Her-

An act of sale passed before the commandant of Point Coupée, in 1774, in presence of two witnesses, wherein it is stated that the *vendor did not sign it, because he did not know how to write;* but it is mentioned that the title was delivered to the vendee, who took immediate possession of the land, possesses the requisites *of an authentic act,* under the Spanish law.

*Parole* sales of immoveables have been repeatedly recognised under the Spanish law; and at that remote period, the *ordinary mark* of a party to an authentic act was not required.

*Parole* evidence is good to prove facts and circumstances of possession at a time when plaintiff's title was unknown, and when the parties could not be suspected of making evidence for themselves.

The acts and authority of a commandant, putting a settler in possession of a part of the

bert, on the grounds that the original had not been signed by the vendor, that it is not an authentic act, and that, therefore, the original must be produced and the signatures proven. The act was passed in 1774, before the commandant of Pointe Coupée, in the presence of two witnesses, and states that the vendor did not sign it, because he did not know how to write; the title is mentioned to have been delivered to the vendee, who, it appears, took immediate possession of the land. We think this act would have been sufficient evidence of title under the Spanish law, which, as this court has repeatedly recognized, permitted parole sales of immoveables; it has all the requisites of an authentic act; as such it remained deposited among the notarial records of Pointe Coupée, and the absence of the vendor's signature is sufficiently accounted for by the public officer who received it; at that remote period, the ordinary mark of a party to an authentic act was not required. In our opinion, the district judge did not err in permitting the copy to be read in evidence.

The other bills of exceptions taken by plaintiff, appear to us to be unfounded : the documentary and parole evidence objected to, was certainly good for the purposes for which it was offered, and particularly to prove facts and circumstances of possession which took place at a time when the plaintiff's title was unknown, and when the parties could not be suspected to make evidence for themselves. The objection made to the introduction of Perrault's original title, goes to its effect and not to its admissibility.

After a careful examination of the facts of the case, and an attentive consideration of the rights of the parties, we have come to the conclusion that it has become unnecessary for us to inquire deeply into the validity of their respective titles. We are not disposed to question the authority of the French commandant of Pointe Coupée to put a settler in the possession of a part of the public domain by a written permission or grant which, showing the extent of the tract conceded, and accompanied with proof of long occupancy, might afterwards be considered by his government as a suffi-

EASTERN DIST.
June, 1840.

DEVALL
vs.
CHOPPIN ET AL.

cient title ; indeed, such a title has very often been recognized subsequently by the Spanish authorities, to be an absolute abandonment of the king's domain, and in a great many instances has been made the foundation, as in the present case, of favorable reports on which the government of the United States has confirmed a great number of private land claims. The jurisprudence of the Supreme Court of the United States on this subject, establishes the principle, "that the acts of an officer to whom a public duty is assigned by his king, within the sphere of that duty, are *prima facie* taken to be within his power, and that he who controverts a grant executed by the lawful authority, takes on himself the burden of showing, that the officer has transcended the powers conferred upon him." 12 *Peters' Reports*, 437 ; 8 *idem.*, 452–3–5, 664 ; 9 *idem.*, 134, 734 ; 6 *idem.*, 727 ; 10 *idem.*, 331. The rule applies also to the judicial proceedings of local officers, to pass the title of land according to the course and practice of the Spanish law in the province of West Florida. 8 *idem.*, 310. "When the act done is contrary to the written order of the king, it shall be presumed that the power has not been exceeded, and that the act was done according to some order known to the king and his officers." 7 *idem.*, 96 ; 8 *idem.*, 447, 451. " And courts of justice ought to require very full proof that he had transcended his powers, before they so determine it." 9 *idem.*, 464, 734. We conclude, therefore, that the authority of the French commandant, cannot 'properly be inquired into in this case. In relation to the question raised by plaintiff, whether the French authorities had the right to grant lands in Louisiana in 1767, it will be conceded that it comes rather late and with bad grace from a party who suffered his titles to lay dormant for upwards of half a century ; and as we deem it entirely useless to make it a matter of serious investigation in this suit, let it be sufficient for us to remark, that it is historically known that the Spanish government never contested the validity of the grants made by the French officers before the Spaniards took possession of the colony ; that the conduct of Spain amounts to at least a tacit ratification ; and that the government of the

public domain, by a written permission or grant, showing the extent of the tract conceded, and accompanied by proof of occupancy, will be considered *prima facie*, a good and sufficient title. The acts of an officer to whom a public duty has been assigned, are *prima facie*, taken to be within his power and authority.

It is historically known that the Spanish government never contested the validity of grants made by the French officers, before the Spaniards took possession of the colony of Louisiana in 1769.

United States, by the 4th section of the act of 2nd March, 1805, has expressly declared that all French grants made while the French government had *the actual possession* of the territory of Louisiana, should be recognized and protected. 1 *Land Laws,* 519 ; 2 *White's New Recopilacion,* 569. In this case, both parties have obtained the confirmation of the United States by the same act of congress, they therefore stand upon an equality with regard to our government ; but, although, if their rights were to be tested on the strength of their respective titles, the plaintiff might perhaps succeed ; we think it is only necessary for us to examine if the defendants have not acquired such title by prescription as to be considered sufficient to destroy the plaintiff's pretensions.

Before considering this question on its real merits, under the evidence adduced by defendants in support of their plea, it will not be unimportant to dispose of two questions raised by plaintiff's counsel for the purpose of showing that the plea of prescription founded on the possession of several individuals, has been interrupted by certain circumstances brought out by the evidence, and that such possession, however long it may have been, cannot benefit the defendants. He contends :

1. That the possession of Mathurin, under the title to him transferred by Philip Bidou, is an interruption, and cannot enure to the benefit of the defendants.

2. That Baudin, who possessed the land by himself and by others, from 1814 to 1834, was in bad faith ; that he knew he was not the owner of the property, as his title under Mrs. Bidou was fraudulent, illegal and void ; and because he was not ignorant of the plaintiff's titles, one of which was confirmed on his own application. He, therefore, maintains that Baudin's possession cannot be of any use to the defendants.

I. From the circumstances of the case, it is clear, that Mrs. Bidou and Mathurin both claimed under the title of Joseph Herbert, whose heir Philip Bidou had alleged himself to be, when he sold to Mathurin. The suit then turned on the validity of this mesne conveyance, and not of the original

*The possession of an usurper, or person under a defective mesne conveyance, and who is evicted, will not interrupt prescription, as against the rightful proprietor, when they both claim under the same original title.*

title. The possession of both parties originated under the same title, and may certainly be considered as a notice to any adverse claimant. We cannot see any good reason to allow to such adverse claimant, who remained silent during the controversy, the benefit of an interruption which he never caused, and which would destroy the effect of the previous possession. Mathurin, being an usurper, was evicted, and the property returned to the first and previous possessor. Vazeille, in his *Traité des Prescriptions, volume* 1, *page* 189, *number* 176, says : "Le possesseur troublé dans sa jouissance a le choix du recours au possessoire ou au pétitoire. Quelle que soit la voie qu'il prenne, le résultat est le même pour lui, si son action intervient dans l'année du trouble. Il est même très juste que, sans considération d'un tems aussi court, toute décision qui proscrit définitivement l'usurpation, fasse disparoitre l'interruption qu'elle avoit produite. La cause cessant, l'effet doit cesser aussi. La raison l'indique, et Domat, l'enseigne dans ses lois civiles. (*Notes, article* 6, *section* 3, *livre* 3.) C'étoit aussi une règle établie, en termes généraux, par la loi, 13, *section* 9, *ff. de acq. et amitt. poss.* Si jussu judicii, res mihi restituta sit, accessionem esse mihi dandam placuit. Ce n'est plus la réintégration par la voie de l'interdit ou de l'action possessoire. Bruneman l'a bien compris ; car, pour expliquer la loi, il présente l'exemple d'une éviction ordonnée contre l'individu qui détenoit la chose depuis six ans, et il dit que le possesseur réintégré *peut joindre la possession de celui qu'il a évincé, à la sienne propre, pour former la prescription, et l'opposer à la tierce personne* qui viendroit revendiquer cette chose. Suivant l'explication de Bruneman, Dunod affirme que 'l'on peut employer la possession de celui qu'on a fait condamner à la désistance.'

"Pothier, dans ses pandectes, livre 41, titre 3, numero 47, tire la même décision de la loi pré-citée. Il dit : Supposons que j'aie commencé de bonne foi la possession d'un fonds, qu'un usurpateur s'en soit emparé, et que je l'aie reprise en vertu d'un jugement, la possession de cet usurpateur comptera pour moi, tout comme si je n'avais pas été dépossédé. See, also, *Troplong, Prescription, vol.* 1, *numbers* 448 and 449,

73     VOL. XV.

in which he quotes the opinion of Cujas, on the text of the law 13 : *Prædone possidente, si jussu judicis res mihi restitua sit, accessionem mihi jussu dandam,* founded on the authority of the Baziliques : " *quod possidebas mala fide dedisti mihi, jussu judicis : accedit mihi tempus tuum ;*" and number 451, in which the author says, "le système dont Cujas est l'organe me paroit sous tout point préférable, soit sous le rapport doctrinal, soit sous le rapport logique." We also adopt this system, and conclude on this point that Mathurïn's possession, far from having caused an interruption, ought to be considered as a continuation of Mrs. Bidou's previous possession to enure to the benefit of her subsequent, *ayant cause.*

II. In order to prescribe, it is necessary that good faith should have existed at the commencement of the prescription. *Old Code, article 72, page* 488; *Louisiana Code, article* 3448. And it cannot be denied that Mrs. Bidou's possession, after the eviction of Mathurin, was one in good faith as well as before ; and that, had she or her representatives transferred the property to the defendants, there would have been no doubt of the accomplishment of the prescription. But it is urged that Baudin, who began to possess for himself in 1814, was in bad faith ; that he knew that the property belonged to others, and that, therefore, he did not possess *animo domini.* Had Baudin been the first possessor, or was the time to establish the prescription to be ascertained or computed by taking his possession as the commencement or origin of the right, the authorities quoted by plaintiff's counsel from Pothier and Troplong, would, perhaps, receive their proper application, and there would probably be no difficulty, under our law, to maintain him in his position. But here, Baudin was an intermediate possessor, and his predecessor was in good faith. *Troplong, Prescription, vol.* 1, *No.* 432, says : " Dès le moment qu'on succède à une personne, on doit pouvoir se servir de sa possession, toutes les fois que le vice qu'on peut lui reprocher n'empêche pas la prescription d'après les règles générales. Ainsi, dans l'exemple donné par Voët, je ne comprends pas pourquoi *la mauvaise foi d'un possesseur intermédiaire* empêcherait la jonction des possessions de bonne foi, qui ont précédé ;

Where the original possessor was in good faith, although an intermediate possessor of the premises held in bad faith, the subsequent possessor in good faith can avail himself of the prescription applicable to such possession.

car il suffit que la bonne foi ait existé au commencement, et la mauvaise foi survenue plus tard ne vicie pas la possession. Qu'importe donc que l'un des possesseurs soit de mauvaise foi, si sa possesion n'est pas *celle qui ouvre* le tems de la prescription." And in *volume 2, numbers* 937 and 938, the same author says : "Puisque *le moment initial* de l'acquisition est le seul point à considérer, il s'ensuit que lorsqu'un individu a possédé de bonne foi un héritage, et qu'il meurt avant l'accomplissement de la prescription, l'héritier qui lui succède continuera valablement à prescrire, quoiqu'il soit de mauvaise foi."

· De même, le successeur à titre particulier. qui acquiert *de mauvaise foi* un immeuble, possédé avec titre et bonne foi par son vendeur, peut *continuer* la prescription commencée par ce dernier, et la conduire à fin, sans qu'on puisse lui objecter sa mauvaise foi. C'est à peu près comme si le vendeur lui-même fut devenu de mauvaise foi depuis son acquisition."

This distinction appears to us perfectly clear ; Baudin himself would have been entitled to prescribe ; and in our opinion, the defendants who hold under him, ought to have the benefit of his, as well as of all the previous possessions. This doctrine is, undoubtedly, a proper and correct interpretation of the article 3448, of the Louisiana Code, that says: "*It is sufficient if the possession has commenced in good faith; and if the possession should afterwards be held in bad faith, that shall not prevent the prescription.*" Under this view of the question, it is immaterial whether Baudin's title under Mrs. Bidou, was fraudulent or not ; and whether he knew, or not, that the Conways had a title which might afterwards prove to be better than his ; and moreover, we are not ready to say that Baudin's title did not become perfect and final, by the judgment by him obtained in 1819, against the agents of Mrs. Bidou, and that the confirmation of the title in his name by the government of the United States, in 1823, ought not also to militate in favor of the defendants.

*If the possession has commenced in good faith, and if it is afterwards held in bad faith, that will not prevent prescription, even if the possessor's title was fraudulent, and he knew another person had a better title.*

On the merits, we think the defendants have completely made out their title to the property in dispute, not only by the prescription of ten years, but perhaps also by that of

thirty years. The facts which we have recapitulated, show clearly that the possession of those under whom defendants have acquired, began in 1774, and no title or good faith was necessary in support of this kind of prescription. *Louisiana Code, article* 3465 ; (and the same rule prevailed under the former laws of Louisiana.) In support of the prescription of ten years, which, if it were necessary, the defendants have even acquired under the Louisiana Code, they have shown : 1st. Good faith in the first and subsequent possessors, at least up to 1814 : 2d. A legal title under the original grantee, sufficient to transfer the property : 3d. A continuous and uninterrupted, peaceable, public and unequivocal possession during the time required by law ; and, 4th. A certainty in the object sold by Perrault to Herbert; being not merely his inchoate title, not even alluded to in the sale, but a tract of land of forty arpents in front, by the ordinary depth, sold with full warranty. *Louisiana Code, articles* 3445, 3449, 3450, 3451, and 3452. It is true that the possession has not always been a corporeal one ; but when it is necessary to complete a possession already begun, the civil possession suffices, provided it has been preceded by the corporeal or actual possession of the thing. *Idem., article* 3453. We are, therefore, of opinion that the district judge decided correctly in rejecting the plaintiff's claim, and in maintaining the defendants in their title and possession of the property.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be affirmed, with costs.