## DAVIS v. THE POLICE JURY OF CONCORDIA.

Where the grant of a right to keep a ferry at a particular place is proved to have been made by a person who was, at the time, governor *de facto* of the Spanish province of Louisiana, the authority to make such a grant will, in the absence of proof of a prohibition to make such grants, be presumed from the fact of its having been exercised.

In a contest between a police jury and one claiming under a grant from the Spanish government, the court cannot enquire into *the* effect of the treaty of San Ildefonso upon grants in Louisiana, made subsequently, by the Spanish government. Such grants must be respected so long as the present government suffers them to remain undisturbed.

Where, for greater convenience, a ferry has been kept up, at a point from a quarter to half a mile higher up the river than that designated by the grant, with the consent of the police jury, who, during the whole time had an absolute .... to control it, they cannot take advantage of this circumstance to claim a forfeiture of the gr.... o.. the ground of non-user.

Where a grant made by a Spanish governor of the right to keep a ... is unlimited as to time, and the legislature have fixed no period after which such grants sha.... to have effect, it must be considered as unlimited.

Where a grantee of the right of keeping a ferry alleges that his right is exclusive, he must show clearly that the grant was intended to be such. The abandonment of the power to provide for the public accommodation by the establishment of other ferries, will not be presumed.

In answer to the petition of the proprietor of a plantation for the grant of a right of ferry, as a privilege to be attached to his plantation, in consideration of his making a certain road, the governor of the province declared " se le concede el privilegio anexo a la habitacion que posée, para que de ella, *con exclusion*, haga las traviesas del rio," &c. *Held*, that where any other meaning can be given to a grant it should not be construed as surrendering forever a franchise and a part of the sovereign power; and that, consequently, the words *con exclusion* can not be considered as a renunciation of the right to establish any other ferry above or below the plantation of the grantee, but as a prohibition to others, to whom no such privilege has been extended, to transport across the river persons or things for hire, within a reasonable distance above or below the plantation of the grantee.

A PPEAL from the District Court of Concordia, *Curry*, J.
The plaintiff alleges that, on the 19th February, 1841, " the *Marquis de Casa Calvo*, then governor general of the province of Louisiana, by appointment of the King of Spain, granted to one *Thomas Thompson*, then of the parish of Concordia, the privilege of keeping a ferry at the post of Concordia in said parish, opposite to the town of Natchez, as a privilege to be attached to the plantation of said *Thompson*, for passing across the river Mississippi, carriages, horses, men, &c., for such a reasonable and customary toll as might be established, and on condition that *Thompson* should clear a certain public road or highway from the post of Concordia to the bayou Crocodile in said parish, as appears, from the original petition and grant annexed to his petition. The plaintiff represents that *Thompson* did fully perform these conditions as appears by the certificate of *Joseph Vidal*, then commandant at said post of Concordia; that immediately thereafter *Thompson* exercised the privilege aforesaid, and performed the duties and enjoyed the profits of the ferry, until the 16th of October, 1803, at which time *Thompson* assigned all his rights and interest in and to said ferry and tract of land to *Joseph Vidal*, and delivered the same accordingly; that the tract of land to which the privilege was attached was sold by *Thompson* to *Vidal* for $4000, when the land, without the ferry, would not at that time have been worth more than $800; that *Vidal* took possession of said ferry and plantation on the 16th of October, 1803, and kept and enjoyed the same from that time until the year 1817, when he sold and delivered the tract of land and ferry to the petitioner; that by the laws, usages and customs of the Spanish government at the time said grant was made, said privilege was exclusive of any other ferry, for the distance of one league above and one league below the same; that he has also a prescriptive right thereto, based on his and his vendor's possession, and enjoyment thereof since the year 1801.

The petition further alleges that, " the police jury of the parish of Concordia on the 4th day of April, 1839, passed an ordinance authorizing the treasurer of the parish, and making it his duty, to sell, after ten days public notice, either at private sale or at public auction, the exclusive privilege of keeping a ferry across the Mississippi river from a point in said parish opposite to the city of Natchez, for a term of not less than one year nor more than three years; that one *Keeton*, the parish treasurer of said parish, in pursuance of said ordinance, has advertised the said ferry for sale, and that he will proceed to sell the same unless arrested by injunction. It is averred that said ordinance is illegal, and

DAVIS
v.
POLICE JURY
OF CONCORDIA.

injurious to the rights of the petitioner, who has an exclusive privilege to the said ferry, the value of which exceeds the sum of $300, and that, should the ordinance be executed, he will suffer damage to a large amount, and more than three hundred dollars. He prays that, the said ordinance may be declared illegal and void, and that the police jury of the parish of Concordia be enjoined from proceeding to execute it, or from in any manner interfering with his rights to the exclusive privilege of said ferry, or disturbing him in the possession and enjoyment of the same and for general relief," &c.

The defendants, in their answer, admitted the existence of the ordinance of the police jury, and that the treasurer of the parish was about proceeding, under that ordinance, to sell the privilege of keeping a ferry for a limited time across the Mississippi, from a point in the parish of Concordia opposite to the town of Natchez. All other allegations in the petition are denied. The defendants denied the existence of any such grant as that under which plaintiff claimed. If such a grant was ever made, they alleged that the conditions annexed to it had not been complied with by the grantee, as he never exercised the privilege. They allege the forfeiture of the grant by non-user, and the legality of the ordinance of the police jury; and pray for damages, and that the plaintiff may be perpetually enjoined from interfering with their right to establish a ferry.

The grant under which the plaintiff claims, and the papers connected with it, are in the following words:

Señor Commandante del Puesto de Concordia:

*Thomas Thompson* con el debido respeto a Vm. dice, que no estando estable-cido aqui hasta ahora mas que cinco habitantes, no podemos hacer los gastos de un camino sin que el Rey nos pagare nuestro trabajo, por lo qual habiendo el Señor Gobernador concedido a *Don Juan Heverand* la traviesa del Rio Negro por hacer el camino a sù costa desde el dicho Rio hasta el Bayù Cocodrilo, el supli-cante propone que desde este Puesto hasta el Bayù Cocodrilo, hara tambien el camino de treinta piés a cuarenta de ancho a sus expensas, contal que se le conceda tener la traviesa desde la habitacion del suplicante hasta el desembarca-dero de Natchez como un privilegio anexo à su habitacion, para lo qual promete tener chalanes à proposito y demas embarcaciones para el efecto. Gracia que espera recibir ·de Vm.                                        THOMAS THOMPSON.
Concordia, 27 de Enero de 1801.

Señor Gobernador General:

La propuesta que hace el suplicante es igual a la que Vs. a *Don Juan Heve-rand.* El corto numero de habitantes que hay en este Puesto no permite que se empleen un trabajo tan costoso sin que se les satisfaga, como le expongo á Vs. en oficio de esta fecha, asi atendidas las ventajas que resultaran recomienda a Vs. la solicitud del suplicante quien es sujeto capaz de cumplir lo que propone-siempre que fuere del agrado de Vs. concederle el privilegio que solicita. Con-cordia, 31 de Enero de 1801.                                    JH. VIDAL.

Nueva Orleans, 19 de Febrero de 1801.

Conformandose *Thomas Thompson* á hacer el camino que propone á sus ex-pensas bajo la inspeccïon del commandante del Puesto de Concordia, se le con-cede el privilegio anexo a la habitacion que posée, para que de ella, con exclusion, haga las traviesas del Rio, cobrando solamente los precios mas equitativos à los transeúntes, que se fixaran con acuerdo del dicho commandante.

                                            EL MARQ. DE CASA CALVO.

En virtud que *Thomas Thompson* ha cumplido con las condiciones que ofreció en este su memorial y que executó bajo mi inspeccion segun lo dispuesto por el Señor Gobernador General en su anterior decreto; se le entrega el presente para que haga constar y posea el derecho exclusivo, que tiene de la traviesa desde este Puesto al desembarcadero de Natchez. Jn. Vidal.

Concordia, 16 de Febrero de 1802.

Davis
*v.*
Police Jury
of Concordia.

The plaintiff established his right to the plantation and ferry by transfers from those claiming under the original grantee. The evidence on the different points submitted to the decision of the court, is fully stated in the opinion delivered by Rost, J. There was a judgment below perpetuating the injunction obtained by the plaintiff, and declaring him to be entitled to the perpetual and exclusive right of keeping a ferry from the town of Vidalia, as originally granted to *Thompson*, as a right attached to his plantation. From this judgment the defendants appealed.

 *Elgee*, for the plaintiff. A ferry is "a liberty by prescription, or the King's grant, to have a boat for passage over a great stream, for carriage of horses and men, for reasonable toll." Termes de la Ley. 3 Black. 219. 12 East. 334. Viner's Abridg. *verbo* Ferry. 3 Maule and Selw. 247. The law will presume that the *Marquis de Casa Calvo* was authorized to make the grant, from the fact of his having made it. *Deval* v. *Choppin*, 15 La. 566. 6 Peters, 727. 7 Ibid. 96. 8 Ibid. 310, 447, 455, 664. 9 Ibid. 134, 464, 734. 10 Ibid. 331. 12 Ibid. 437. The instrument under which plaintiff claims is rather a contract than a simple grant. A consideration was paid for it, and it is consequently no monopoly. 11 Peters, 567. Contracts founded on a consideration should receive a favorable interpretation. 1 Condens. Rep. S. C. U. S. 446. 2 Ibid. 132. 11 Peters, 597–8. The grant under which plaintiff claims gives a right of ferry in perpetuity, and an exclusive privilege. The right is attached to the plantation, to endure as long as the soil. Exclusiveness is an incident of such a grant. 3 Kent, 458. 11 Peters, 597. The evidence is conclusive that the conditions of the grant were complied with. There is nothing novel in the grant of the exclusive right to keep a ferry, in consideration of cutting out a road. The records of our own legislation show this. 1 Moreau's Dig. 478, 480, 483, 484, 486, 489, 490, 492, 494. To ascertain the extent of the rights of ferry granted, the instrument must be construed as such an instrument would be construed between individuals, that is, that no ferry should be established within a reasonable distance of the one granted. The establishment of any ferry which would diminish the tolls of the first grantee would impair the obligation of the contract.

Plaintiff's rights have not been lost by non-user; they have been exercised ever since the grant. The place at which the ferry was kept up was selected solely for the public convenience. It is not pretended that any one else has ever exercised the right of keeping a ferry within the space over which plaintiff's exclusive right extends.

The case of the *Charles River Bridge Co.* v. *The Warren Bridge Co. et al.*, 11 Peters, 420, is in favor of plaintiff, for had that case presented the features that his does, it would have been decided differently. Even as it was, in a bench of seven judges, three were for the plaintiffs—justices *Story, Thompson, McLean*. That case was decided on the following points : 1st. That there was no *contract* between the plaintiffs and the legislature of Massachusetts. 2d. That there never was a transfer to the plaintiffs of the ancient ferry rights. 3d.

DAVIS
v.
POLICE JURY
OF CONCORDIA.

That if there ever was such a transfer the ancient ferry rights were not exclusive. 4th. That when the legislature incorporated plaintiffs, they never agreed not to incorporate another Bridge Company. See opinion of Judge McLean, pp. 560, 563, 564, 567, 569, 577, 578, 583. See also opinion of Judge Story, p, 590, *et seq.*

The police jury had no right to delegate authority to any individual, to sell the exclusive privilege to a ferry for any number of years. Their powers are limited to the establishment of ferries. 2 Moreau's Dig. p. 242.

It will be argued that the grant to the original grantee was not exclusive. The words *con exclusion* establish the contrary. But it is said, that it is exclusive only for the front of the *Thompson* tract; and that the establishment of another ferry, within five hundred yards of plaintiff's, does not violate the exclusive rights of the latter. All the authorities are directly the reverse, and this too even when there are no words of exclusion in the grant. See 3 Blackstone, 219. 3 Kent, 458 and 447. 11 Peters, p. 626 *et seq.*

The contemporaneous exposition of a contract by the parties to it, is one of the best guides to its correct interpretation. Ever since the date of the grant, the ferry boat, for the public convenience, has started at the point it now does. The spirit of the contract is fulfilled ; none of the parties ever deemed, that to start from the front of the *Thompson* tract was essential; if it had been, they would, in 1801, have run the ferry from that point, or *Thompson* would have had the concession in express terms higher up the river. *Vidal,* the commandant and secretary of the Spanish government, who lived at the place, had an eye himself to this privilege when it was conceded, but who, at all events, gave a high price, $4,000 cash, for it in 1803, must be presumed very ignorant of Spanish customs and usages to have suffered the grant to be lost, by not starting his boats from the proper point on the river. The presumption rather is that, the wise and just rule of the common law was incorporated amongst the Spanish usages; that the grantee of the ferry, had a reasonable distance up and down the river, within which no rival ferry would be permitted. Our own law of 1805, passed immediately after the change of government in 1805, inhibiting a ferry from being set up within one league up and down the river of the ancient ferry, leads me to conclude that, such was the well settled custom of the country. However, for the Spanish governor to grant the exclusive privilege of a ferry for a valuable consideration, and to reserve at the same time to himself the right to establish another ferry immediately alongside of the one first granted, would be to violate the first principles of justice, and repugnant to common sense. The term in the grant " *attached to the plantation*" establishes its perpetuity. It was not to *Thompson* or his heirs, but it was an incorporeal hereditament, which should exist as long as the land to which it was attached.

*R. N.,* and *A. N. Ogden,* on the same side. The grant to *Thompson* having been made in consideration of work and labor to be performed by the grantee, is a contract ; and the act of the defendants in establishing another ferry is a violation of the 10th sect. of the 1st art. of the constitution of the United States. It will be contended that the words of the grant confine the privilege to the *Thompson* tract; but the petition of the grantee, the certificate of the commandant, and the grant itself show that, the port of Concordia and the town of Natchez were the *termini* of the ferry.

*Stacy,* for the defendants. *Thompson* acquired nothing by the grant from the

Spanish authorities, Spain, by the treaty of San Ildefonso, of the 1st October, 1800, having ceded the province of Louisiana to France, and thereby parted with all authority over the public domain, &c. Congress have declared all grants made by the Spanish government subsequently to the date of that treaty, " to be, and to have been, from the beginning, null and void, and of no effect in law and equity." See 3d vol. Laws U. S., p. 609, s. 14. *Foster* v. *Neilson*, 2 Peters, 204. All such grants, unless confirmed by the United States, remained null. See also *De Armas* v. *Mayor &c. of New Orleans*, 5 La. 105. The right of establishing ferries appertained to the sovereign authority, and had been transferred to France. The authority of Spain was limited to such acts as might be necessary to preserve the colony until delivered to the French authorities. It could not make a grant in perpetuity of a privilege such as that claimed by *Thompson*. *Polk* v. *Wendell*, 9 Cranch, 87. Vattel, ch. 20, p. 109. Civil Code, art. 444. *New Orleans* v. *United States*, 10 Peters, 731.

The grant being a divestment of a portion of sovereignty, if valid, is subject to be revoked at the will of the sovereign. *Dartmouth College* v. *Woodward*, 4 Wheaton, 629. All that the grantee can require is indemnification for the money expended by him under it. Civ. Code, art, 138. By the act of 19 April, 1805, 2 Martin's Dig. 360, the legislature provided for the establishment of ferries throughout the territory, and repealed all previous grants. This law recognized no existing right. After its promulgation no one was authorized to keep a ferry unless licensed according to its provisions. By the stat. of 25th March, 1813, 2 Martin's Dig. 392, the exclusive control and regulation of ferries is given to the police juries. They are authorized to establish ferries, and to let them out annually to the highest bidder.

The grant was not intended to be perpetual. Its language does not warrant such a pretence. The service, or labor for which the grant was asked, does not authorize such a conclusion. Nothing can be claimed under a grant by implication. *Jackson* v. *Reeves*, 3 Caines, 302, *Carnal* v. *Wheeler*, 2 Barn. & Adolph. 792. *Dock Company* v. *Marche*, 8 Ibid, 42. *Charles River Bridge* v. *Warren Bridge*, 11 Peters, 548 *et seq.* An ambiguity in the grant must operate against the grantee. Civ. Code, art. 1710. A license or grant is revocable, unless a certain time be fixed. *Taylor* v. *Waters*, 7 Taunt. 374. 5 Moore & Payne, 712. The grant to *Thompson* does not purport to have been made for any determinate period.

*Thompson* never complied with the condition of the grant by making the road; nor has any ferry ever been kept up from *Thompson's* plantation; the only ferry ever established was from a point a quarter or half a mile above that plantation. The grant has thus been forfeited by non-user. No title could be acquired by plaintiff by prescription. The State cannot be prescribed against. *Parish Treasurer* v. *Russell*, 3 La. 95. Though the plaintiff should be considered as entitled to keep up his ferry, the police jury is authorized to establish others. 11 Peters, 546. No Spanish law or custom has been shown prohibiting the establishing another ferry at any point above or below the *Thompson* tract. The exclusive privilege of *Thompson* could not extend beyond the limits of his plantation.

The ferry from *Thompson's* tract was a different one from that reserved for the post or village of Concordia. See 2 Am. State Papers, pp. 763–4. *Vidal* never used the ferry granted to *Thompson*; but usurped the one at Vidalia, which belonged to the municipal domain of the village (2 Recopilacion, pp. 100,

DAVIS
*v.*
POLICE JURY
OF CONCORDIA.

DAVIS
v.
POLICE JURY
OF CONCORDIA.

110, 111, 112), and the administration of which belonged to the intendant alone. N. Recopilacion, 104, 105. The grant of the ferry by the Governor General was a nullity. The grant could only have been made by the Intendant. The right of granting or selling the public lands, which was vested in the Governor by a royal letter of August 24th, 1770, (N. R. p. 460) was withdrawn by a royal order of 22d October, 1798, and transferred to the Intendant. Ibid, pp. 477, 245, 234, 238.

*H. A. Bullard*, on the same side. The counsel for the plaintiff, contends that the police jury, under the act of 1813, had no authority to let out a ferry for a longer period than one year. To this we answer: 1st. That no such ground for an injunction is set forth in the petition; and secondly, that the plaintiff has no right to contest the ordinance on that ground. It is obvious that the only issue made up by the pleadings is, whether the ferry established by the ordinance of the police jury interferes with the franchise claimed by the plaintiff, and whether the police jury had a right to establish a ferry at all. So far as that question is involved, it is quite immaterial, whether the ferry was to be sold out every year, or every third year.

The judgment of the court was pronounced by

ROST, J.* This case has been already before the Supreme Court. The facts it discloses and the questions it presents, are fully stated in the opinion of the court. See 19 La. p. 533. It was remanded for the admission of evidence rejected on the first trial. That evidence is now in the record, and the case is before us, on an appeal taken by the defendants from a judgment rendered against them on the second trial. The first ground on which they ask a reversal of the judgment is, that the *Marquis de Casa Calvo* was not governor of Louisiana at the time he made to *Thomas Thompson* the grant under which the plaintiff claims, and that, if he had been, he had not the power to make such a grant.

*Casa Calvo* was a brigadier general in the Spanish armies, and when the colony was delivered to France, he acted as commissioner with *Salcedo*, the then governor. It does not appear that he ever had a commission from the King of Spain as governor; but it is proved that, *Gayoso* having died in 1799, he was sent here by the captain general of the island of Cuba, whose jurisdiction extended over the province of Louisiana, to act as governor *ad interim*, until the arrival of the person who should receive a commission from the King, and that he did act in that capacity, from the beginning of October, 1799, till June or July, 1801, at which time governor *Salcedo* arrived. Among the witnesses is an officer who served under him during that time, and a merchant who was enabled by his assistance to introduce a cargo of merchandize from New Orleans into Vera Cruz. The evidence is uncontradicted and bears upon its face the character of truth. As it is well known that military officers of high rank were often entrusted by the Spanish government with important civil offices in the colonies, we consider it proved that *Casa Calvo* was governor, *de facto*, on the 19th of February, 1801, at which time the grant bears date.

The question whether he had power to make the grant cannot be determined in this controversy. The defendants cannot question his authority. Unless a prohibition to make such grants is shown, we will presume the authority from the fact of its being exercised. Neither he, nor the intendant, considered that

---

* EUSTIS, C. J., did not sit on the trial of this case.

the prohibition to grant lands, extended to the granting of privileges to keep ferries; and we will not, without sufficient cause, disregard the construction they both put upon their respective jurisdictions. The grant of the land on which the ferry is established was made by the intendant; that of the ferry by the governor. The presumption is that both acted within the sphere of their powers. *Devall* v. *Choppin et al.* 15 La. 566, and the cases there cited. See, also, *The United States* v. *Arredondo et al.* 6 Peters, 691.

The effect of the treaty of San Ildefonso upon the grants made by the Spanish government subsequent to its date, is a question not open to our enquiry. We are not called upon to pass upon the sovereign rights and powers of the United States, or of the State of Louisiana. Whatever these may be, the police jury of the parish of Concordia has no warrant for their exercise, and is bound by the acts of a former government so long as the present government suffers those acts to remain undisturbed. It is proper to state, however, that the validity of the grants of land made by the Spanish government after the date of that treaty, is recognised by the fourth section of the act of Congress, passed in 1805, for the adjustment of land claims in Louisiana. 1 Martins' Dig., 244.

Upon the second ground taken by the defendants that, the conditions of the grant had not been complied with, a great deal of evidence has been introduced on both sides. It shows that *Thompson* did make a road; and several witnesses testify that it was sufficient for the line of travel of those days. It is well known that at that period, and long after, inland roads in Louisiana were nothing but traces. The Spaniards carefully avoided the labor of cutting down trees; they found it easier to make a mark upon them, and use them as guides through the wilderness. When the cane and underwood were cut away and the trees blazed, the road was considered as made. The roads on the banks of navigable streams were the only exception. These were royal roads, and the timber upon them was to be cut down and removed, by an express condition in the grants of the land fronting upon them. *Walker*, one of the witnesses, states that the road passed partly through cane-brakes and partly through the open woods; that the cane and some of the small trees and cypress knees were cut away, and the trees blazed. Other witnesses state that it was occasionally travelled by carts and wagons. It is true that other witnesses testify that the road, when they saw it, was not thirty feet wide. In that part of it which lay through the open woods, it must have been exceedingly difficult to tell whether it was, or was not, of the proper width. Where, on the other hand, the cane had been cut down, it must have grown up again immediately afterwards, so as to leave open only the trace which travellers followed. *Thompson* was not required by his grant to keep the road in repair. We think that, at this distance of time, there is sufficient evidence to corroborate the certificate of the commandant, under whose inspection the road was to be made, that the conditions of the grant had been substantially complied with.

The defendants further allege that, if the grant is otherwise valid, it has been lost by non-user, because the ferry, instead of being kept in front of the *Thompson* tract of land, has been kept all the time on land of the same proprietor from a quarter to half a mile higher up the river. The defendants forget that the ferry has been all the time under the absolute control of their police regulations. If the landing has not been kept in the proper place, it is their act and their fault, and they cannot make this a cause of complaint against the plaintiff. If the ferry has, in fact, been kept at the most convenient place, they cannot now

allege against him, that he went out of his way with their consent, and for the public accommodation.

This brings us to the last question in the case : What are the extent and limits of the grant? The question of its duration we dismiss from our consideration. Whatever may be the power of the State to limit the duration of such grants, there is not, to our knowledge, any solemn expression of legislative will fixing the time beyond which they will cease to have effect; and, so long as the State abstains from interfering, the grant must endure.

1st. The plaintiff contends that the grant, under which he claims, originated in a contract, by which the exclusive privilege of keeping a ferry in front of his plantation was given to *Thomas Thompson*, as a consideration for making a road, which he did make.

2d. That the words *con exclusion* in the grant mean that, the sovereign or his agents shall not establish another ferry within a reasonable distance of his own.

3d. That the ferry attempted to be established at Vidalia by the defendants is on the same line of travel, and in the immediate vicinity of his grant; and that, if it goes into operation, the obligation of the contract under which he holds will be impaired, and his profits greatly diminished, contrary to the true intent and meaning of the grant.

We consider it our duty in all cases to pay great deference to the decisions of the Supreme Court of the United States, and not to differ from them but for grave reasons. In cases over which that tribunal has appellate jurisdiction, as it has in this, we consider their decisions as the true exposition of the law. The questions under consideration have all, in our opinion, been determined in *The Charles River Bridge* v. *The Warren Bridge and others,* 11 Peters, 420. According to the doctrine laid down in that decision, when an individual, or a corporation, alleges that the State has surrendered forever its power of public accommodation on an important line of travel, the community have a right to insist " that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the State to abandon it does not appear." The court further say that, in order to entitle themselves to relief, the parties must show that the legislature contracted not to do the act of which they complain. The charter, say the court, contains no such stipulation; there is no exclusive privilege given over the waters of Charles river, above or below the bridge; no engagement from the State that another shall not be erected, and no undertaking not to sanction competition, nor to make improvements that may diminish the amount of its income.

The words *con exclusion,* found in the grant of the plaintiff in this case, do not make up for the want of all those stipulations. Under the rule laid down by the Supreme Court, if any other meaning can be given to a grant besides that which would surrender forever a franchise and a part of the sovereign power, that meaning must be preferred. The words *con exclusion* have another obvious meaning—it is that of the prohibition in the act of 1813. 1 Moreau's Dig., 475. That prohibition does not mean that police juries may not establish ferries nearer than two leagues from each other, on the same stream. Its meaning is that, when the police jury have established a ferry and leased it, no person, not licensed, shall have the right to cross men and horses, for money, at the distance of a league up and down the river from the landing places of the licensed ferry. Police juries may establish as many ferries as they please.

We consider that in this case, all persons living within a reasonable distance

of the ferry were inhibited by the grant from interfering with it, so as to reduce its profits; but we perceive no engagement on the part of the grantor that another ferry shall not be established in the vicinity, when the increased population of the country may make it necessary. The grant contains no undertaking not to sanction competition, nor to make improvements that may diminish the income of the grantee. The *Thompson* tract of land, to which the ferry is annexed, is from a quarter to a half mile below the town of Vidalia. Suppose that a similar grant had been made half a mile below the city of New Orleans, could it be seriously contended that no other ferry could be established within the three miles above that point, which the city of New Orleans occupies. The mere statement of the case shows that the surrender of the power, if it can at all be made, is at least not to be presumed. The difference of population between New Orleans and Vidalia, does not affect the rule by which the case is to be decided.

The legislature has given to police juries full power to establish ferries, when they deem it necessary or expedient. Whether the establishment of a ferry at Vidalia by the defendants, be a proper exercise of the discretion vested in them, is a question which we are not competent to decide.

For the reasons assigned, it is ordered that the injuction be dissolved, and that there be judgment in favor of the defendants, with costs in both courts. It is further ordered that the rights of the defendants to recover from the plaintiff, such damages as they may have sustained by the suing out and continuance of the injunction be reserved.