## PEAKE *v.* CITY OF NEW ORLEANS.

*(Circuit Court, E. D. Louisiana.* May 31, 1889.)

1. MUNICIPAL CORPORATIONS—FISCAL MANAGEMENT—LIMIT OF INDEBTEDNESS.

In 1858 the legislature of Louisiana adopted a system of drainage for the city of New Orleans, the work to be controlled by commissioners, and the expense to be defrayed by assessments on the land benefited. Act La. 1871, No. 30, abolished the boards of commissioners and intrusted the control of the work to the board of administrators of the city. The assessments collected were to be used only as a drainage fund, and the expenses paid by warrants payable therefrom. A constitutional amendment taking effect January 1, 1875, prohibited the city from increasing its indebtedness, but allowed the increase of the debt of the drainage fund. Warrants to complainants were drawn on the drainage fund after the adoption of said amendment. *Held,* that the city could not be made liable for the amount of the warrants as a municipal corporation, for mismanagement of the drainage fund, whereby a deficit occurred, so as to increase its general indebtedness.

2. SAME.

The same rule applies to warrants issued for the purchase of machinery authorized by act 1876, No. 16, which required payment to be made by warrants on the drainage fund.

3. SAME.

Nor would the city be liable on the theory that it had falsely held out that there was a fund available for the payment of the warrants.

4. SAME.

Failure to collect the assessments and complete the drainage would not render the city liable for the amount of the warrants when it appears that the assessments had been uncollected by the commissioners, before the city took charge of the work, for 13 years, and that they were uncollectible without incurring cost equal to their amount, and that the system of drainage was itself so impracticable that failure to complete it was inevitable.

5. SAME—BONDS

The city having retired bonds issued on the drainage fund as authorized by act 1872, No. 73, and issued in lieu thereof its own bonds, it would be entitled to a credit for the amount of which it had relieved the drainage fund, though the act required the bonds retired to be replaced by bonds payable out of the same fund.

In Equity. Bill for account.

*R. De Gray* and *T. J. Semmes*, for complainant.

*Carleton Hunt,* City Atty., *White & Saunders,* and *Harry T. Hall,* for defendant.

Before PARDEE and BILLINGS, JJ.

PER CURIAM. The complainant having obtained a judgment on the law side of the court against the city of New Orleans merely as trustee of the "drainage fund" upon certain warrants drawn by the city against that fund, has instituted this suit in equity against the city for an accounting as trustee of the drainage fund. The cause is submitted for a final decree upon the pleadings and proofs. There are also exceptions to the conclusion reached by the master upon the law and the facts. These involve the answers to the questions fundamental to a decision of the cause upon its merits, and therefore the matter before us is what judgment ought to be rendered upon the pleadings and the evidence. In the year 1858 the legislature of Louisiana adopted a system of leveeing and drainage in the parishes of Orleans and Jefferson, to be effected through several boards of district commissioners, and provided for raising the necessary funds by authorizing the levy of a uniform assessment or assessments upon the superficial or square foot of lands situate within the draining sections or districts. The legislatures of 1859 and 1861 supplemented this act, but left the boards of commissioners unchanged. The commissioners for the several draining districts continued in office until April, 1871, and some canals had been dug by them; but the extent thereof is not shown. In this condition of affairs the legislature passed act No. 30 of 1871, which abolished the boards of draining commissioners, transferred to and subrogated the board of administrators of the city of New Orleans to all the rights, powers, and facilities enjoyed by said commissioners, and directed said administrators to collect the balance due of the assessments as shown by the books of the First and Second drainage districts, which assessments were confirmed and made exigible. The board of administrators was also directed by the said act to make assessments of two mills per superficial foot on the lands in the Third draining district and such other lands as might be brought within the protection levees contemplated by the said act No. 30 of 1871; and said board of administrators were directed to enforce and collect said assessments, and all funds collected were to be placed to the credit of the Mississippi & Mexican Gulf Ship Canal Company, (the corporation that was to do the work under said act No. 30 of 1871,) and held as a fund to be applied solely for the drainage of New Orleans and Carrollton. The width and the depth of the canals, as dug, and the protection levees, as built, under said act were to be measured by the city surveyor, to be certified by him; and the administrator of public accounts in the city of New Orleans, on presentation to him of said surveyor's certificate, was to draw his warrant on the administrator of finance in payment of said work at the rate of 50 cents per cubic yard for excavations made, and 50 cents per cubic yard for levees built. The warrant thus drawn, it was made the duty of the administrator of finance to pay on presentation, in case there should be any funds in the city treasury to the credit

of the said Mississippi & Mexican Gulf Ship Canal Company; but, should there not be sufficient funds to pay, then said administrator of finance was required to indorse upon the same the date of presentation, after which date the said warrants were to bear interest at the rate of 8 per cent. per annum until paid.

The first question presented by the exceptions to the master's report, and by the case itself on the merits, is whether the city, as a municipal corporation, is indebted to the drainage fund for an assessment to the amount of some $700,000 upon the public streets and public squares. The legislature levied a tax upon a certain area, and by a subsequent act made the owners personally liable. It is difficult to conclude that the legislature ever meant to subject public things to a lien for a tax, which of course would carry with it the right to foreclose the lien, and to sell the public thing. Again, it is difficult to see how the city of New Orleans, who is simply charged with the administration of a public thing, is an owner. As an original question, we should be inclined to hold that the assessment levied was intended by the legislature to be put upon the property within the designated area, exclusive of the public streets and squares. On the other hand, the commissioners actually assessed the public streets and squares, and put down the city as owner, apparently in accord with the views of the supreme court of the state, as expressed in *Draining Co. Case*, 11 La. Ann. 377, decided under the drainage act of 1835; and the legislature thereafter (act No. 30 of 1871) affirmed the assessments already made. This point need not be definitely decided by us; as, even if the city owed the amount of this assessment to the fund, it has, in our opinion, according to the proofs, much more than paid it.

The second question we are called upon to decide is: Does the evidence establish any such neglect, or misapplication, or diversion in the city's administration of the drainage fund, as to make her liable as a municipal corporation? It is important to observe that it is admitted that early warrants drawn against the drainage fund, up to January 1, 1875, had been fully paid and retired; that the constitutional provision prohibiting the city's debt from being increased in any manner whatever went into operation on that day; and that the complainant's warrants were drawn after that day. It has been urged that the contract of the Mississippi & Mexican Gulf Ship Canal Company under act No. 30 of 1871, out of which the drainage warrants arose, could not be impaired by the constitutional amendment. This is conceded. But that contract stipulated only for the issue of warrants to be drawn against the drainage fund, and the constitutional amendment allows this. But this does not help the complainant. The prohibition of the constitution was against the city increasing her own debt. The provision of the amendment was to increase, as was desirable and proper, the debt of the drainage fund. These warrants, being on their face, and in express terms, payable only from the drainage fund, and having been issued, and as all implied, for work done subsequent to the amendment, the original or subsequent takers of the warrants took them with the inhibition of

the constitution stamped upon them, and they cannot, either by the orders of the city officials or in any other way, be permitted to increase the city's own debt.

It was also urged that a portion of these warrants, viz., upwards of $300,000 of them, was for the purchase price of the machinery and contract, which the legislature authorized the city to buy, as provided in act No. 16 of 1876. The answer to this argument is that, while the city was by the legislature required to buy, it was required to pay in warrants against the drainage fund. This class of warrants was placed, therefore, by the legislature in precisely the same category as the other drainage warrants issued for work. The holders of them were as far from having a claim against the city as were the holders of the other warrants against the fund; and with reference to both classes of warrants no rights could spring up which would increase the debt of the city of New Orleans to the holders of either class of warrants. This view would, in our opinion, be conclusive upon this question, even if it had been established that the city had violated any of its duties as trustee.

It is also urged by the solicitors of the complainant that there is an equity in favor of the complainant, which approaches that of a holder of purely negotiable security, in that there was a holding out on her part that there was a fund, when there was none available. We think the facts of the case show that the city, under legislative mandate, issued the warrants against a fund created by the legislature, and entirely separate from her own funds. This the warrants disclosed in the plainest terms. There was no guaranty asked, nor given, nor implied. The right was that of being paid out of a particular fund, which was created and disposed of by the legislature. Hence there can be no enlargement of the rights of the holder beyond that expressed in the instrument.

Nor do we find in the record evidence of negligence on the part of the city which should be treated as waste, or create any charge beyond that upon the fund. The two grounds upon which this charge is sought to be maintained are (1) failure on the part of the defendant to collect the assessments, and (2) failure on its part to push on the work of drainage, whereby the lands subject to the tax would have been rendered valuable enough to have paid the imposed tax. As to failure to collect, when these assessments were handed over to the city to collect, they had been assessed 13 years, and for that period had been in the hands of commissioners created expressly for the conduct of the drainage system, and with no other business. If such bureaus had failed to collect for such a period, the inference is strongly forced upon us that the assessments were substantially uncollectible, especially by a municipal corporation, herself crushed by debts. This is corroborated by the outcome of the *mandamus* proceedings taken by Van Orden, transferee of the company, and as warrant-holder, to compel the city to issue writs of *fieri facias* against the owners in 1876. To the application for that writ the city answered that the cost of the proceeding would equal, in her opinion, the amount realized. The result showed her estimate to be nearly correct; for the cost of the 125 writs selected by the warrant-holders—and

therefore presumably the best for the purpose—was $34,000, and the amount collected under them only $36,000.

Whatever else we have been impressed with upon this ground of complaint has equal force when considered with reference to the second ground of alleged fault on the part of the city,—failure to complete the system of projected drainage. In our opinion, the failure to collect and the failure to complete were due to the system of drainage as created and modified by the legislature, and would have occurred no matter who had been charged with its execution. A brief statement of the leading features of the original scheme of the legislature, and its subsequent modifications, will, we think, demonstrate this. The tax was arbitrarily levied upon each square foot of the district at a uniform rate without any regard to the value of the land. This, taken in connection with another provision, that no land should be sold for taxes unless the price it brought should be equal to the tax levied, rendered the collection of a large portion of the tax a sheer impossibility, as the land was worth less than the tax. It is urged by the complainant's solicitors that the completion of the system would have raised the value of the submerged lands, but this conclusion must rest upon the premise that those who were to do the work of draining would be willing to look for payment to a tax to be collected out of submerged lands, which had not sufficient value to pay the imposed assessment. Then it is to be observed that the availability of these drainage assessments was still further diminished by the act of the legislature which stripped the assessment of all connection with the owner, leaving no resource except against the land taxed; and the supreme court of the state held that land should not be subject to any assessment which had received no benefit.

A final embarrassment, which any trustee would have found difficult to overcome, should be mentioned, viz., that by the act No. 30 of 1871 the legislature selected a contractor, and fixed the rate per cubic foot to be paid for excavations at within 15 cents of three times the original estimate for the work; and, though the system was less than two-thirds completed, the amount of excavation in cubic feet, as determined by the proper authority selected by the legislature, was double that upon which the assessments were calculated. It may be added that the city was entirely without means to prosecute the work to completion. She was prohibited by the constitution from in any manner or form increasing her debt. The drainage funds were, as shown herein, inadequate and uncollectible, and already burdened with a debt of over $600,000 on account of drainage warrants outstanding. In short, the system of drainage has remained incomplete, and has failed, because it was an unwise and inadequate system, where every motive springing from human cupidity was against its success, and where provision originally inadequate was consumed by extortionate prices established by the legislature itself.

There are several charges, amounting to about $100,000, which it is urged the city illegally allowed and paid out of the fund. That for the services of Roselius & Philips was clearly a charge upon the fund, for it was for the saving of the entire fund. That for the clerks selected by

Van Orden was imposed by the very act of transfer to the city, was publicly recorded, and was as well known and as subject to opposition in the courts by the warrant-holders as to resistance from the city, and was in good faith intended for the benefit of the trust fund. We think the payment for legal services to the then city attorney was an error, and would perhaps make the city liable for that amount,—some $14,000. This item would then fall into the same class as the assessments upon the public streets, etc.

There remains to be considered how much the city has paid out for the fund by taking up warrants outstanding against it and substituting her own absolute obligations. According to the master's report, the city retired $1,600,000 of the drainage warrants, and gave therefor her own absolute 7 per cent. 50-year bonds. She did this under the act 73 of 1872. If, as we think, that act required her to issue bonds of the same tenor as the warrants which she took up, i. e., payable out of the fund, then the case would be that of a trustee who, by error, had paid out money, or issued securities for the benefit of the estate of the *cestui que trust*, in which case she would be credited with the amount to the extent of which she had relieved the fund. On the other hand, if the legislature meant to have the city issue its own bonds, it then becomes a question of legislative intent as to how the forced assumption should be treated. Referring to the act, we find the bonds were to be marked "Drainage Series;" were to be paid out of the drainage fund after the payment of the warrants; and that no other provision whatever was made for retiring or paying the principal. We think it clear that bonds thus to be issued by a trustee, even if they were intended to be absolutely her own, and thus to be paid, were intended to be charged against the fund, and that the city is a creditor to that extent of the fund. This would leave the city a creditor against the fund to the amount of $1,600,000, and if we should consider her a debtor to the fund to the amount of the assessments on the public streets and squares, and for the $14,000 paid to the city attorney, in the aggregate to the amount of $714,000, it would still leave a balance in her favor of nearly $800,000. Let the report of the master be amended so as to conform to this opinion, and, upon that being done, let the bill be dismissed at the cost of complainant.