SOMMERVILLE, J.
The board of directors of the public schools of the parish of Orleans sues defendant to recover possession of a fractional part of section 16, township *35 12 south, range 11 east, comprising 258.42 acres, situated in the second district of the city of New Orleans, and reserved by the United States government for school purposes.
The defendant resists the suit of plaintiff on various grounds, which will be noted in their order. There was judgment in favor of plaintiff, and defendant appeals.
The plan of subdividing the public lands of the states of the Union was adopted by act of the Congress, May 18, 1796.
In accordance with that act, township 12 south, range 11 east, was surveyed by Ross and Sulakowski, deputy United States surveyors ; and that survey was approved by E. W. Poster, Surveyor General for Louisiana, June 22, 1872, as appears by a certified copy of a plat of township 12, range 11 east, Southeast land district, east of Mississippi river, St. Helena Meridian, La., found in the record. In the copy of the plat of said township is found the fractional part of the sixteenth section, in place, claimed by plaintiff.
[1 -4] The survey referred to is attacked by defendant as being not authorized and incorrect, and as not binding upon any one.
A survey made -by the government must be held conclusive against any collateral attacks in controversies between individuals. There must be some tribunal to which final jurisdiction is given in respect to the matter of survey, and no other tribunal is so competent to deal with the matter as the Land Department. Whether a survey as originally made is correct or not is a matter submitted exclusively to the Land Department, and over which the courts have no jurisdiction otherwise than by original proceedings in equity. 10 Encyc. of U. S. Supreme Court Reports, p. 80.
The United States government has provided for two methods of surveying lands in Louisiana. One is known as the rectangular system of surveying, and is provided for by the Act of Congress of May 18, 1796, c. 29, 1 Stat. 464, which provides that each township shall be six miles square, subdivided into thirty-six sections, each one mile square. The sections are to be numbered respectively, beginning with No. 1, in the northeast corner, and proceeding west and east alternately through the township with progressive numbers, until 36 sections are surveyed.
If, in making this survey of the public lands in a township’, a complete, or an approved, grant is found that overlaps a part of any section, the surveyor places this complete or approved grant on his map, and only the remainder of the section not covered by the grant is public land.
The other method of surveying the lands in Louisiana is the survey of lots or tracts along water courses, etc. The United States government, by the Act of March 3, 1811, c. 46, § 2, 2 Stats. 662, authorizes the public lands on water courses, etc., to be surveyed and subdivided into tracts of 58 poles in front and 465 poles in depth.
The Act of May 24, 1824, c. 141, 4 Stat. 34, authorizes the President to direct the survey of lands fronting rivers, water courses, etc., by lots, 2 acres front by 40 acres in depth.
The tracts surveyed along water courses in accordance with the acts of 1811 and 1824 are commonly known as “lots” or “radiating sections” or “fractional sections.”
The Department of the Interior of the United States has ruled that sections 16 when they are “radiating sections” or “fractiona] sections” or “lots,” as they are indiscriminately called, which front on water courses, do not belong to the state for the benefit of the township for school purposes, but that only the sections or parts of sections that are rectangularly surveyed and are “in place” belong to the state for school purposes.
In the case of Cragin v. Powell, 128 U. S. 691, 9 Sup. Ct. 203, 32 L. Ed. 565, the court held “that the power to make and correct surveys of the public lands belongs to the political department of the government,” and:
*37 “When lands are granted, according to an official survey, the plat, with all its notes, descriptions, and landmarks, becomes as much a part of the grant and controls, so far as the limits are concerned, as if such descriptive features were written out on the face of the deed.
“The description and plat of the original government survey made by a Surveyor General from the field notes and filed in the Land Office are conclusive. The section lines and corners as laid down in the description and the plat are binding upon all parties.”
And we say in Boatner v. Scott, 1 Rob. 546:
“A survey of a portion of the public lands, under an order from the land office, approved by the Surveyor General, is conclusive, ■ unless it be shown that it deviates from the order.”
The laws of the United States are clear to the effect that every sixteenth section in place, or part of a sixteenth section in place, belongs to the state of Louisiana, for school purposes, and the parish school board having the administration of the schools and the property intended for their benefit are entitled to institute suits for recovery of such sections of land found in the possession of third persons.
Plaintiff is claiming only a fraction of the sixteenth section, comprising 258 acres, for the reason that the balance of the section was disposed of prior to the acquisition of the land by the United States government under the treaty with France in 1803. Nevertheless it is a fraction of a sixteenth section in township 12 south, and it has been surveyed by the United States and given to the state of Louisiana for school purposes. It therefore belongs to the state of Louisiana; and it is, and will remain, public property until it has been properly disposed of, and the proceeds thereof devoted to school purposes.
The evidence in the record shows that the United States government issued indemnity scrip to the state for that part of the section covered by a prior grant to Milne, and which could not be delivered to the state.
The claim of defendant that there is a navigable stream through township 12 south, namely, the Bayou St. John, and that under the United States statutes of 1811 and 1824 the sections in the township are what are known as radiating sections, cannot be considered for the reasons given above. The survey made by the government is conclusive upon the court and the parties to this litigation. The official survey shows the section to be in place as the sixteenth section, or fractional part of said section, and not a radiating section.
The court has always followed the ruling of the Secretary of the Interior to the effect that radiating sections are not reserved for school purposes, and that they may be acquired by the state and others under the laws of the United States. Reference is made by defendant to the opinions of the court in Bres v. Louviere, 37 La. Ann. 736, and Lauve v. Wilson, 114 La. 699, 38 South. 522, wherein the evidence clearly showed that sections 16 in those cases were not parts of a rectangular section 16 in place; as is the case in this suit. See, also, Barton v. Hempkin, 19 La. 511. In the latter case, it is plainly stated that the section there referred to was “the lot or fractional section No. 16.”
The section in controversy was not separated from the public domain until June 22, 1872. It appears that at the latter date the state of Louisiana made claim for the land in question, together with other lands in the vicinity, under the Swamp Land Grant, and that the selection was presented to the Secretary of the Interior for his approval or disapproval; and he disapproved this selection because of its being a sixteenth section rectangularly surveyed; and, being such, it went to the state of Louisiana under the acts of Congress of 1806 and 1811 for school purposes.
The grant of sections 16 in place for the use of schools is a part of the land system of the United States, and such section belongs to the state if the defendant has not a title *39 by adverse possession. As the property was public property, and prescription does not run against the United States or the state of Louisiana, the plea of prescription filed by defendant should have been overruled.
Defendant contends that the land in question did not belong to the United States government at the date of the passage of the act reserving sixteenth sections for schools. It sets up title in itself and its ancestors, claiming that Prance or Spain, it is not clear which, made a grant or concession of the land to Carlos Terascon through or by a French officer, Gov. Aubry, in 1766, while Louisiana was under the dominion of Spain; and that said title was a complete title.
The legal title thus set up by defendant is not in the record; and the only evidence of this concession is a declaration made by Terascon in an act" of sale made to Andre Jung, in 1773, wherein he declared that the property is “the same held by me by concession made to be by Monsieur Aubry, French governor, at the time of his domination, before Stans. Foucault, commissary, as appears in the titles he delivered to the purchaser.” The concession or grant, or a copy thereof, was not offered in evidence. Defendant asks the court to presume upon the strength of the declaration made by Terascon, and copied above, that such a concession or grant was made, and that it is in full force and effect. Under the present law, the patent is the instrument which passes title from the United States. It is the governmental conveyance. If defendant and its ancestors in title possessed a title superior to that of the plaintiff, a court of equity would, under proper pleadings, enforce said equity by compelling a transfer of the legal title. But defendant has set forth merely a legal title, and it cannot be permitted to offer evidence in support of an equitable claim which would entitle it to a conveyance of the legal title.
Congress alone has the power to declare the dignity and effect of titles emanating from the United States, or from those from whom defendant may have acquired title under the treaty by which Louisiana was ceded to the United States.
Defendant says that its title to the land in controversy is protected by the treaty entered into between the United States and France, which prevented the property in question from ever becoming the property of the United States government. And it cites authorities going to show that where complete titles had been made by the several governments of Louisiana before Louisiana was ceded to the United States they were recognized by the laws of the Congress and by the decisions of the courts. But defendant does not offer a complete title. It asks the court to presume that a complete grant was issued to Terascon in 1766.
In the suit of Lobdell v. Clark, 4 La. Ann. 99, we define the difference between a complete grant and an incomplete grant, concluding:
“No title passed from the French and Spanish sovereign for lands in the territory of Orleans and the district of Louisiana by a mere order of survey; until a patent issued, all inchoate grants remained within the discretion of the grantor; and they were not changed in their character by the treaty by which Louisiana was acquired, that treaty imposing on the government of the United States only a political obligation to perfect them, which cannot be enforced by any action of the judicial tribunals.”
Defendant cites the case of Devall v. Choppin, 15 La. 566, decided in 1840, as authority for assuming that the acts of those who asserted themselves to be in authority under the regimes prior to the acquisition by the United States government were regular and binding. That case was between individuals who were claiming under titles regularly confirmed by acts of Congress on the 28th of February, 1823, which were accompanied by plats of survey made under the Spanish government, showing their locations.
Defendant in this case has not produced *41 any act of Congress in its favor, or in favor of its ancestors in title; and it has not filed any concession, grant, or survey showing the location of the land issued by any one whatever. And the decision in the case cited is based on the prescription of 10 and 30 years pleaded by defendant.
In the course of the opinion it is said:
“After a careful examination of the facts of the case, and an attentive consideration of the rights of the parties, we have come to the conclusion that it has become unnecessary for us to inquire deeply into the validity of their respective titles. We are not disposed to question the authority of the French commandant of Pointe C'oupee to put a settler in the possession of a part of the public domain by a written permission or grant which, showing the extent of the tract conceded, and accompanied with proof of long occupancy, might afterwards be considered by his government as a sufficient title; indeed, such a title has very often been recognized subsequently, by the Spanish authorities, to be an absolute abandonment of the King’s domain, and in a great many instances has been made the foundation, as in the present ease, of favorable reports on which the government of the United States has confirmed a great number of private land claims. The jurisprudence of the Supreme Court of the United States on this subject establishes the principle ‘that the acts of an officer to whom a public duty is assigned by his king, within the sphere of that duty, are prima facie taken to be within his power, and that he who controverts a grant executed by the lawful authority takes on himself the burden of showing that the officer has transcended the powers conferred upon him.’ ”
In the case just quoted from it appears that there was a written concession or grant showing the extent of the tract conceded, which is not so in the case before us; and Mr. Aubry, the French officer, who is said to have made the grant to Terascon, is clearly not an officer to whom the Spanish government granted authority to make such concessions of land.
In the later case of Davis v. Police Jury, 1 La. Ann. 288, we say:
“The question whether he (Oasa Calvo, the de facto governor in 1801) had power to make the grant cannot be determined in this controversy. The defendants cannot question his authority.”
Had defendant shown that Monsieur Aubry was representing the Spanish government, and it had produced sufficient evidence of a grant made by him to Terascon, duly recorded, it would have produced prima facie evidence that Aubry was acting within his power. Delassus v. United States, 9 Pet. 134, 9 L. Ed. 71.
[5] A grant or a concession made by an officer lawfully authorized to make it carries with it prima facie evidence that the grant is within his power.
In a decision subsequently rendered by this court, in the case of Lavergne’s Heirs v. Elkins’ Heirs, 17 La. 220, it is shown very clearly that the court, in the several eases before us, referred to complete grants made by the French and Spanish government. It was held, under complete grants, that no confirmation was required by this government to give validity to them. And we there quote from the instructions by the secretary of the treasurer to the registers of the land Offices in New Orleans and Opelousas in the year 1805, with reference to grants made prior to October 1, 1800, to the effect that persons claiming under the first two sections of the act referred to, or under incomplete titles, shall file notices of their claims with the register. And on the register, properly authenticated, was found recorded a grant in the usual form to Jean Lavergne, the ancestor of plaintiffs in that case, for the land claimed by them.
Since 1750 the territory of Louisiana has been the subject of three international transfers:
First. The transfer from France to Spain by the secret Treaty of Fontainebleau, on November 3, 1762, which was published at Versailles, April 21, 1764, and printed in New Orleans, in October, 1764.
Second. The transfer by Spain to France by the Treaty of St. Ildefonso, on October 1, 1800, by which the territory was ordered delivered, on October 15,1802, and which treaty became effective by the acceptance thereof by the Duke of Parma on March 21, 1801.
*43 Third. The transfer by Prance to the United States by the Treaty of Paris, on the 30th of April, 1803 (8 Stat. p. 200).
After each of the above transfers of sovereignty the ceding government remained in possession for considerable time after the conclusion of the treaty, and during such possession there were land grants made by the officers of the ceding government in possession, and these grants have been the subject of a great number of legal controversies waged before the Supreme Court of the United States; and the principles enunciated in those cases have been formulated in a paragraph of the Encyclopedia of United States Supreme Court Reports, vol. X, p. 271, as follows:
“Where a sovereignty cedes a part of its territory to another, the disposal of the public domain thereby ceded passes to the latter, and any grant thereafter made by the former is void ; and the fact that the authorities of the ceding sovereign retain possession for several years thereafter can make no difference. Por cases as to the validity of grants arising under such circumstances, see note 87. Where a survey is made of part of a descriptive grant, before the time fixed by the treaty and act of Congress, an order or permission tO' survey the residue elsewhere, made afterwards, is void, as in contravention of the terms of the treaty and the act of Congress; it being in effect and substance a new grant, made after the power of the government to make grants had ceased. Spanish grants made in Texas for lands in the ‘Neutral Ground,’ east of the Sabine, from 1790 to 1800, are valid. Of course, such grants may be confirmed by the sovereignty holding the territory under the cession.”
The theory upon which the null and void grant in this case is claimed to have been confirmed by the Spanish government is that, when Carlos Terascon washed to sell the tract of land which he claimed had béen granted to him, he employed Don Carlos Troudeau, royal surveyor of the Spanish government, to make out a plan subdividing the property in order to be able to sell it by a definite and intelligent description. But the acts of Don Carlos Troudeau, in preparing private plans for one claiming to be owner of property would not be binding on the Spanish government any more than a private plan prepared by a deputy surveyor of the city of New Orleans would be binding on the city of New Orleans, or a private survey made by a deputy United States surveyor would be binding on the United States government.
[6] In the case of United States v. King, 3 How. 773, 11 L. Ed. 824, it was held that the principles of law involved in that case were not new to the court, and it was there said that:
“The land claimed was not severed from the public domain, by the Spanish authorities, and set apart as private property, and, consequently, it passed to the United States, by the treaty which ceded to them all the public and unappropriated lands.”
That was a case which went from the state of Louisiana and where the court held that “the title under the treaty of cession being in the United States, an equitable title, if the defendant in error could show one, would be no defense”; and there was judgment in favor of the government. And the title to this land, under the treaty of cession, was held to be in the United States.
[7] The question presented in this case was reviewed and passed upon by the Supreme Court of the United States in the ease of United States v. D’Auterive, 10 How. 609, 13 L. Ed. 560, decided in 1850, ten years after our decision in Devall v. Choppin, supra. The court there held that a grant of Louisiana land, made by French authorities after the treaty of Fontainebleau, November 3, 1762, wherein the King of France ceded to the King of 'Spain the province of Louisiana, was void. For the reasons there stated, a grant made by the French Governor Aubry to Terascon in 1766 is void, if evidence of such grant had been produced in this cause.
The court therein say:
“This instrument purports to he a grant from Charles Philippe Aubry, knight of the royal and military order of St. Louis, commandant of the king in Louisiana, and Dionysius Nicholas Foucault, filling the functions of director in that province, to Messrs. D’Auterive and *45 Masse, and bearing date at New Orleans on the 2d day of March, 1765.
“The proceedings for the establishment of this claim in the court below were instituted under the authority of an act of Congress of May 26, 1824, entitled ‘An act to enable claimants to land within the state of Missouri and territory of Arkansas, to institute proceedings to try the validity of their claims,’ which law was in part re-enacted on the 17th of June, 1844, and extended in its operation to the state of Louisiana. Vide 5 Stats, at Large, 676. The purposes and the effect of the law of 1824, with reference both to the claims and the proceedings embraced within its provisions, have been heretofore examined by this court. They were especially considered at the last term, in the case of the United States v. Reynes, 9 How. 127, 13 L. Ed. 74, and the following conclusions were then distinctly enunciated as implied necessarily in a just interpretation of that statute. Thus (9 How. 146, 147 [13 L. Ed. 74]), in speaking of the statute of 1824, revived by the act of 1844, this court explicitly declare that: ‘With respect to that interpretation of these acts of Congress which would expound them as conferring on applicants new rights not previously existing, we would remark that such an interpretation accords neither with the language nor the obvious spirit of these laws • for if we look to the language of the act of 1824, we find that the grants, surveys, etc., which are authorized to be brought before the courts, are those only which have been legally made, granted, or issued, and which were also protected by treaty. The legal integrity of these claims (involving necessarily the competency of the authority which conferred them) was a qualification inseparably associated by the law with that of their being pi'otected by treaty. And as to the spirit and intention of the law, had it designed to create new rights, or to enlarge others previously existing, the natural and obvious means of so doing would have been a direct declaration to that effect; certainly not a provision placing these alleged rights in an adversary position to the government, to be vindicated by mere dint of evidence not to be resisted. The provision of the second section of the act of 1824, declaring that petitions presented under that act shall be conducted according to the rules of a court of equity, should be understood rather as excluding the technicalities of proceedings in courts, than as varying in any degree the rights of parties litigant; as designed to prevent delays in adjudicating upon titles, as is further shown in another part of the same sentence, where it is declared that these petitions shall be tried without continuance, unless for cause shown. The limitation, too, maintained as to the character of claims, and that imposed upon the courts in adjudicating upon them, is farther evinced in that part of the same section which says that the court shall hear and determine all questions relative to the title of the claimants, the extent, locality, and boundaries of the claim, and by final decree shall settle and determine the question of the validity of the title according to the law of nations, the stipulations of any treaty, 'and proceedings under the same, the several acts of Congress, and the laws and ordinances of the government from which it is alleged to have been derived.’ ”
The court then refers to the instrument or grant held by the appellees, while in this case appellant has not produced an instrument of any description, and proceed to say:
“On the 3d day of November, 1762, by a treaty, or, as it is termed in the language of the king, by ‘a special act,’ done at Fontainebleau, Louis XV ceded to the king of Spain the entire province of Louisiana, including the island and city of New Orleans. The character and extent of this act of cession, as evinced by the instructions from the French king, dated at Versailles, April 21, 1764, should be noted in this place, as they are decisive of the relative positions of the parties to that act, and of the extent of their powers posterior thereto, over the territories or persons comprised within its provisions. Nothing surely can be more 'comprehensive or absolute than the transfer announced by the king of France, or the declaration of his .relinquishment of all power or rights in the subject transferred. The language of the French king to D’Abadie, director general and commandant of Louisiana, is as follows: ‘Having ceded to my very dear and best beloved cousin, the king of Spain, and to his successors, in full property, purely and simply and without exceptions, the whole country known by the name of Louisiana’ — he proceeds to command his director general that, op the receipt of his instructions, ‘whether they come to your hands by the officers of his Catholic majesty, or directly by such French vessels as may be charged with the same, you are to deliver up to the governor or officer appointed for that purpose by the king of Spain, the said country and colony of Louisiana, and the posts thereon depending, likewise the city and island of New Orleans, in such state and condition as they shall be found to be in on the day of the said cession; being willing in all time to come that they shall belong to his Catholic majesty, to be governed and administered by his governors and officers, and be possessed by him in full property, and without exceptions.’
“The cases of the United States v. Reynes, 9 How. 127 [13 L. Ed. 74], and of Davis v. Police Jury of Concordia, 9 How. 280 [13 L. Ed. 138], decided at the last term of this court, devolved upon it the necessity for a particular examination of the rules and principles applicable to the construction of treaties; and, in the adjudication of the cases above mentioned, the following rules are either explicitly affirmed or necessarily implied: That compacts between governments or nations, like those between individuals, should be interpreted according to the natural, fair, and received acceptation of the *47 terms in which they are expressed. That the obligation of such compacts, unless suspended by some condition or stipulation therein contained, commences with their execution, by the authorized agents of the contracting parties; and that their subsequent ratification by the principals themselves has relation to the period of signature. That any act or proceeding, therefore, between the signing and the ratification of a treaty, by either of the contracting parties, in contravention of the stipulations of the compact, would be a fraud upon the other party, and could have no validity consistently with a recognition of the compact itself. As a regular corollary from these principles, and as deducible from the law of reason and the law of nations, it was ruled in the cases just mentioned that a nation which has ceded away her sovereignty and dominion over a territory could, with respect to that territory, rightfully exert no power by which the dominion and sovereignty so ceded would be impaired or diminished. [United States v. Reynes] 9 How. 148, 149 [13 L. Ed. 74], and [Davis v. Police Jury of Concordia] 9 How. 289, 290, 291 [13 L. Ed. 138.]
“In the cases just cited, and particularly in that of the United States v. Reynes, it became proper to examine the rights of a ceding and retiring government as a government de facto over the territory ceded. This examination was induced by the circumstance that the claimant against the United States rested his pretensions, in a great degree, upon the position that, after the treaty of St. Ildefonso, and anterior to an actual delivery to the Erench authorities, the government of Spain, as a government de facto, retained the rights of sovereignty and dominion over the territory of Louisiana, and, as incident thereto, the power of granting away the public domain. But this court distinguished between the proceedings of an adversary government, acting in the character and capacity of an independent perfect sovereignty, unaffected by any stipulation, and acts done in fraud, or in violation of express concessions or compacts. It said that .the former, as the acts of a government de facto, might be respected and sanctioned by a succeeding power; the latter could impose no obligation to respect them, because they would have been performed in bad faith, and in violation of acknowledged rights existing in others. Admitting the absolute verity of the document under which the appellees deduce their title, and about which no serious question appears to have been raised, can the validity of this title be sustained consistently with the rules and principles propounded above, and in the cases to which reference has been made? The grant from Aubry and Eoucault, the commandant and the director of the province of Louisiana, to the ancestor of the appellees, bears date on the 2d of March, 1765, between two and three years posterior in time to the cession of the province by France to Spain, and rather more than ten months after the order from the French monarch for the actual delivery of the territory to the Spanish authorities. Under these circumstances, then, the act of the French officers must be regarded as wholly unauthorized and inoperative to vest any title in the ancestor of the appellees, those acts being inconsistent with the existing relations between the kingdoms of France and Spain. It is true that Spain, during the continuance of her sovereignty and possession in Louisiana, might have adopted and confirmed this grant, but no such recognition thereof by Spain is shown or pretended; so far from there being proof of such recognition, it appears that a large portion of the lands comprised within this grant was bestowed by the Spanish government upon other grantees. Neither is there in the record proof of allegation that, during the short reign of the French republic under the treaty of retrocession, the claim of D’Auterive was sanctioned, or even brought to the notice of that republic.
“It follows, then, from the view of this case here taken, that the claim of the appellees cannot be sustained upon any general and controlling principle of the law of nations, nor upon any stipulation between the powers holding the territory of Louisiana prior to its transfer to the United States. The fate of this claim must depend exclusively upon the authority and the acts of the government of this country, and we will now consider how far it is affected by those acts and that authority. It has been heretofore repeatedly ruled by this court that the control and recognition of claims like that now before us were subjects belonging peculiarly to the political power of the government ; and that, in the adjudication of those claims, the courts of the United States expound and enforce the ordinances of the political power. Guided by these rules, and looking to the acts of the Legislature, we find it declared by the act of Congress of March 26, 1804, § 14 (2 Stats. at Large, 287): ‘That all grants for lands within the territories ceded by the French republic to the United States by the treaty of the 30th of April, 1803, the title whereof was, at the date of the treaty of St. Ildefonso, in the crown or government of Spain, and every act and proceeding subsequent thereto, of whatsoever nature, towards the obtaining any grant, title, or claim to such lands, and under whatsoever authority transacted or pretended, be, and the same are hereby declared to be, and from the beginning to have been, null, void, and of no effect in law or in equity.’
“Within the comprehensive language of this provision the case before us necessarily falls; as the inefficiency of the French concession, after the treaty of Fontainebleau, to convey any title, left the title in the government of Spain, where it remained up to, and at the date of, the treaty of St. Ildefonso. The reservation in the proviso to the section just quoted, in favor of actual settlers under the laws, customs, and usages of Spain, cannot include the case under consideration, as this is not an instance of a title asserted upon any such laws or usages, or *49 founded on mere settlement; but one professing to be founded upon the grant made by the French commandant, independently of the authority of Spain, qnd exceeding in extent the quantity of land awarded to settlers by the proviso above mentioned.”
And, again, in the case of United States v. Ducros, 15 How. 38, 14 L. Ed. 591, the court say:
“A grant of land in Louisiana by the French authorities in 1764 is void. The province was ceded to Spain in 1762. In 1793 certain legal proceedings were had before Baron de Carondelet in his judicial capacity, wherein the property now claimed was described as part of the estate of the grantor of the present claimant. But this did not amount to a confirmation of the title in his political character.”
The act of Congress (2 Stat. p. 324) referred to in the D’Auterive opinion treats of three classes of titles. The first section deals with persons or legal representatives of persons who on the 1st day of October, 1800, were residents of the territory and had obtained from France or Spain respectively, during the time that said governments had been in actual possession of the territory, and had had duly registered warrants or orders of survey for lands lying within said territory to which the Indian title had been extinguished, and which were on that day, to wit, October 1, 1800, actually inhabited and cultivated by said person or persons for his or their use, and that said person or persons were the head of a family and above the age of 21 years.
“Any person or persons possessing all of the above requirements could have their titles completed and confirmed, provided they produced the evidence before the board of commissioners as required by said act.
“Section 2 relates to persons above the age of 21 who had, prior to the 20th of December, 1803, with the permission of some Spanish officer and in conformity with the laws and customs and usages of the Spanish government, actually settled on said land. These persons were granted authority, under certain conditions, to have their claims confirmed.
“The third class of titles covered by this act are found in section 4, which section refers to ‘legal’ French or Spanish grants made and completed prior to the 1st oí October, 1800.
“This act of the Congress provides, in section 4, that all persons making claims to land, either under the provisions of section 1, 2, or 4, must register same in accordance with the provisions of the act.
“Persons who claimed land under the provisions of sections 1 or 2 of the act were required to make proof to the board of commissioners that they possessed the land in accordance with the pre-requisites of those sections before their title could be confirmed; but persons who possessed complete ‘legal’ French or Spanish grants were not required to make any proof except the original grant.”
The concluding portion of section 4, which refers to all and any grants, provides:
“And if such persons shall neglect to deliver such notice in writing of his claim, together with a plat as aforesaid, or cause to be recorded some written evidence of the same, all his right, so far as the same is derived from the two first sections of this act, shall become' void, and forever thereafter be barred; nor shall any incomplete grant, warrant, order of survey, deed of conveyance, or other written evidence, which shall not be recorded as above directed, ever after be considered or admitted as evidence in any court of the United States, against any grant derived from the United States.”
And so, in the case before us, we hold that the act of the French officer, Aubry, if he ever acted, was wholly unauthorized, and it was inoperative to vest any title in the ancestor of appellant, as that act would have been inconsistent with the existing relations between the kingdoms of France and Spain, particularly in view of the act of Congress stated above to the effect that incomplete grants not recorded are null and barred, and shall not be considered or admitted in evidence. The inchoate or incomplete title set up by defendant has not been registered with any board of commissioners appointed by the United States which had authority to investigate and confirm land grants in Louisiana. The court cannot therefore receive in evidence the suggested grant to Terascon, or the survey tendered. Lobdell v. Clark, 4 La. Ann. 99. The grant is not in the records of the American State Papers, where it would be found, even if the records of the government of Louisiana were destroyed by fire in 1788, as was suggested by defendant might have been the case.
*51 The decision in the D’Auterive Case was approved in Coffee v. Groover, 123 U. S. 1, 8 Sup. Ct. 1, 31 L. Ed. 51, wherein it was held that the existence of a de facto government would not influence the decision on the points involved. To the same effect are the decisions in the four cases of the United States v. Pillerin et al., 13 How. 9, 14 L. Ed. 28, where the D’Auterive Case was again referred to and upheld, to the effect that grants must be made by competent authority to fall within the terms of the treaty and the laws. See, also, United States v. Ducros, 15 How. 38, 14 L. Ed. 591, and Arceneaux v. De Benoit, 21 La. Ann. 673.
The argument by defendant to tbe effect that, as a grant was made to Terascon by the French officer, Aubry, during the Spanish regime, and that France subsequently came into possession of Louisiana, that the grant became binding upon France, is without merit. If Aubry ever made the grant to Terascon, he was not acting for France at the time; and, as France did not grant to Terascon through or by Aubry, it was not bound by anything Aubry had done when it came into possession of the land again by cession from Spain.
This case is one of great importance because of the value of the property in dispute; and we have therefore dealt with the question just considered at great length, citing numerous authorities on the position of defendant. The decision in the D’Auterive Case settles the issues in this. Defendant’s title to the land in question was neither a legal nor an equitable one under the decisions of the Supreme Court of the United States extending a long time back.
Defendant also claims title upon certain proceedings in the case of Peake v. City of New Orleans, 38 Fed. 779, decree affirmed 139 U. S. 342, 11 Sup. Ct. 541, 35 L. Ed. 131, No. 12008 of the docket of the Circuit Court of the United States for the Eastern District of Louisiana. It says that the property was sold under the foreclosure of a trust created by the Legislature of the state of Louisiana in 1871, by Act No. 30, under which act the property was ordered to be transferred in trust to the city of New Orleans; and under order of the Circuit Court of the United States the property.was sold and adjudicated at public auction to C. A. Gaudet, who transferred, by mesne conveyances, to defendant. Also, that the board of drainage commissioners acquired the property at private sale from the Milne Asylum for destitute orphan girls; and that the same was disposed of by the state under said Act No. 30 of 1871, if it had ever been designated as school land by the United States government.
[8] The claim of defendant that the property involved was subject to drainage taxes, and that it had been transferred to the city of New Orleans and sold for the taxes due thereon, is untenable. The property is, and has ever been, public property; either in the possession of the United States government or in that of the government of the state of Louisiana. It was not subject to taxation therefore of any kind. This claim of defendant has been discussed and disposed of in the case of Leader Realty Co. v. Lakeview Land Co. et al., 133 La. 646, on page 652, 63 South. 253, on page 255, as will appear as follows:
“In the syllabus of defendant’s brief the grounds of .the estoppel are stated as follows:
“ ‘The state of Louisiana having passed valid laws to incorporate drainage boards in the parishes of Orleans and Jefferson, and having given such boards power to levy a drainage tax to pay for the work of drainage, with the right to purchase the land, could not, after the assessment has been made, the work done, the land bought in by the drainage board and held in trust to pay for drainage work, issue a valid patent to a stranger which would have the effect of divesting the drainage board of their title or their transferees.’
“We fail to discover the slightest ground for the state’s being estopped. It is now fully settled that:
“ ‘No estoppel results against the state by reason of the fact that the tax assessor erroneously assessed the land to an individual and the tax collector sold it for nonpayment of taxes resulting from such assessment.’ Slattery v. Leonard, 110 La. 86, 34 South. 139; Cordill v. *53 Quaker Realty Co., 130 La. 933, 58 South. 819; In re Veith, 130 La. 1108, 58 South. 899; Quaker Realty Co. v. Purcell, 131 La. 496, 59 South. 915; Quaker Realty Co. v. Labasse, 131 La. 996, 60 South. 661 [Ann. Cas. 1914A, 1073].
“In the next place, it is not true to say that the state authorized her own lands to be taxed, for she did not; on the contrary, she made an appropriation of $81,000 as her contribution towards the drainage in question. The rule is that state property is impliedly excepted when authority is given to levy a tax. A. & E. of L., vol. 12, pp. 367-4569; 37 Cyc. 872. Then, again, nothing shows that the drainage work in question was ever done. On the contrary, the contention of defendant is that these lands were still waist-deep under water when it undertook to drain them. Finally, these lands were sold in suits against the owners of the front lands. Why the state, who was not a party to those suits and had no notice of them, should be bound by any proceedings had in them, it would not be easy to reconcile with sound legal principles.”
Defendant cites the decision in the Peake Case, 139 U. S. 342, 11 Sup. Ct. 541, 35 L. Ed. 131, as authority for holding that public property was subject to be seized and sold for drainage taxes. But the court did not so hold. It held that the city of New Orleans might be charged with the costs of the improvement, or the amount of the taxes, in the following words:
“Considerable discussion took place on the argument, and is also found in the briefs, as to whether streets and other public property can be subjected to a lien for a share of the cost of local improvements, or whether the city stands in such relation to these properties that it can be held liable as owner. It is unnecessary to enter into the merits of this discussion. It may be that streets and other public grounds cannot be sold for nonpayment of assessments for local improvements or other taxes, and it may be that the city is not technically their owner, and yet, at the same time, it may be true that the city, as representing the public, may, under proper proceedings, be charged as debtor for the proportion of the cost of local improvements, which, by the rule established, would fall upon such public property.”
Liens were not claimed against state property in that case, and the city of New Orleans was not therein held for any amount whatever, for the reason that the record showed that it had paid over more drainage taxes than it had collected. The opinion in the Peake Case was affirmed in the Warner Case, 175 U. S. 120, 20 Sup. Ct. 44, 44 L. Ed. 96. There it was held that the city of New Orleans should pay the drainage tax on public property as the agent of the entire body of its citizens, who were assumed to have been indebted to the extent of the tax. The court said that it is true that liens and privileges for drainage taxes did not apply to public property, and that:
“While it is doubtless true that public property was not intended to be chargeable with a lien under which it might be sold and title pass to private parties, it by no means follows that the city is not liable, and that in such cases the amount should not be paid out of the treasury.”
The court, in those two cases, did not hold that public property belonging to the city, or the state, or the United States government, was liable to seizure and sale for the nonpayment of drainage assessments or taxes. It therefore follows that the attempted seizure, or transfer, or sale, of the public property involved in this suit, surveyed and set apart in 1872 and reserved by the United States government for public education, was null and void, and that title thereto did not pass to defendant and its authors in title.
[9] The act of Congress of February 15, 1843, c. 33, 5 U. S. Stats. at Large, 600, forbids the sale of sixteenth sections, or school lands, “without the consent of the inhabitants of such township or district, to be obtained in such manner as the legislature of said state shall by law direct.” And the Legislature of Louisiana, in the acts of 1855 (Laws 1855, No. 316) have passed the necessary laws by which such lands may only be sold. Sections 2958, 2959, 2960, 2961, 2962, 2963, R. S.
Judgment affirmed.