178 So.2d 428 (1965)
TERREBONNE PARISH SCHOOL BOARD, for the Use and Benefit of the PUBLIC SCHOOLS OF TERREBONNE PARISH et al.
v.
TEXACO, INC.
No. 6306.
Court of Appeal of Louisiana, First Circuit.
July 1, 1965.
Rehearing Denied September 27, 1965.
Writ Refused November 23, 1965.
*429 Wiley G. Lastrapes, Daniel P. Hurley, New Orleans, Helm, Simon, Caffery & Duhe, New Iberia, Charles F. Bailey, of Bailey & Mouton, Lafayette, for appellants.
Lloyd J. Cobb, of Cobb & Wright, Mettery I. Sherry, Jr., New Orleans, Wilmore J. Broussard, Jr., Houma, Herbert W. Christenberry, Jr., New Orleans, for appellees.
Jack P. F. Gremillion, Atty. Gen., State of Louisiana, Baton Rouge, Edward M. Carmouche, Asst. Atty. Gen., Lake Charles, John L. Madden, John A. Bevins, Asst. Attys. Gen., Baton Rouge, for intervenors.
Milling, Saal, Sanders, Benson & Woodward, New Orleans, amicus curiae.
Before ELLIS, LOTTINGER, LANDRY, REID, and BAILES, JJ.
REID, Judge.
This is a suit for the cancellation of a mineral lease granted by the State Mineral Board to Union Oil Company of California, which was subsequently assigned to Texaco, Inc., insofar as such lease affects or may affect any and all rights of petitioners. The area in dispute is Section 16, Township 21 South, Range 14 East, Parish of Terrebonne, Louisiana. The petitioners are the Terrebonne Parish School Board and its lessees, Robert D. Sterling, Ruth L. Sterling and Robert W. O'Meara. The defendant is Texaco, Inc. The State of Louisiana and the State Mineral Board have intervened and have adopted the position of Texaco, Inc., including the adoption of all evidence offered by Texaco, Inc., without offering any other evidence on their own behalf.
The Lower Court awarded judgment in favor of the petitioners and against the defendant *430 and intervenors, the defendant and intervenors have each taken a suspensive appeal.
On March 25, 1946, a mineral lease designated as "State Mineral Lease No. 725" was granted by the State of Louisiana to Union Oil Company of California covering a large area known as Tract 586, the description of which specifically excluded from said lease "school and tax lands." This mineral lease was subsequently assigned to Texaco, Inc., who now is the exclusive owner thereof. Although at the outset of this suit both Union Oil Company of California and Texaco, Inc. owned an interest in said lease, and were both named defendants, the interest of Union Oil Company of California has subsequently been assigned to Texaco, Inc., who now is the sole owner of the said mineral lease, and Union Oil Company of California has been allowed to withdraw as a defendant in this suit.
Subsequently, on January 6, 1948, the Terrebonne Parish School Board granted a mineral lease to Union Oil Company of California on Section 16, Township 21 South Range 14 East. This lease was approved by the State Mineral Board and the Attorney General's Office as to form and legality. This mineral lease was released by the lessee on January 31, 1950.
On January 10, 1953 the Terrebonne Parish School Board granted a mineral lease on the same property to Robert B. Prentiss and M. H. Marr which lease was subsequently acquired in full ownership by mesne conveyances by Robert D. Sterling, Ruth L. Sterling and Robert W. O'Meara. This lease was approved on January 14, 1953 by the State Mineral Board and by the Attorney General's Office as to form and legality, and in due course a well was successfully drilled on the property covered by this lease. Shut-in royalties were paid the School Board until subsequent to the institution of the present suit when the well was put on production. On March 24, 1959 the School Board and its mineral lessees, who hereafter will collectively be referred to as petitioners, instituted this proceeding to cancel the lease above mentioned from State to Union Oil Company of California as it affects the 16th Section involved.
On May 13, 1959 the State of Louisiana and the State Mineral Board intervened in this suit, uniting with defendants, as the defense and the prayer of the State of Louisiana and the State Mineral Board are identical to that of Texaco Inc. they will all hereafter be referred to as defendants.
The request made by the State and the Mineral Board to withdraw was denied after which they applied to this Court for supervisory writs on March 18, 1962. This application was denied on April 16, 1962. The Supreme Court of Louisiana on May 24, 1962, denied their application for remedial writs.
The defendants contend that the 16th Section involved herein, or a part thereof, was the bed of a navigable waterway in the year 1812 when Louisiana became a State, or since that time said waterway has become navigable, and, therefore, the title rests in the State of Louisiana by virtue of its inherent sovereignty, and only the State Mineral Board has the right to lease water bottoms in a 16th Section. The petitioners, on the contrary, assert that the Louisiana Legislature has granted School Boards full authority over 16th Sections regardless of the physical characteristics of said sections, and therefore, that 16th Sections were dedicated by the United States and reserved for public schools as a sacred trust prior to Louisiana's Statehood. Louisiana became a State subject to, and charged with, the prior trust and therefore, while legal title to this 16th Section is in the State of Louisiana as trustee, by virtue of the Acts of Congress of April 21, 1806 (2 Stat. 391, Ch. 39) March 3, 1811 (2 Stat. 662, 665, Ch. 46, Sec. 10) and the Louisiana Protraction Statute of April 23, 1912 (37 Stat. 90, Ch. 88) such title is held in trust for the benefit of the public schools, which trust has been recognized and acknowledged *431 by State laws. In substance, the petitioners maintain that it is immaterial whether or not this 16th Section, or any part thereof, was the bed of a navigable waterway in 1812 or thereafter.
The District Court, after trial thereof, rendered judgment in favor of petitioners and against defendants. The defendants have taken suspensive appeal.
The property in question concerns the bed of what is known as Mud Hole Bay and Mud Hole Bayou situated in Section 16, Township 21 South, Range 14 East. Mud Hole Bay and Mud Hole Bayou are situated along the Louisiana Coast line. The Bay comprises the greater portion of Sections 15 and 16 of said township and range and Mud Hole Bayou runs in a southerly direction to Mud Hole Bay. The defendants have agreed that the high lands situated in Section 16 are owned by the State of Louisiana, but held in trust for the schools.
On November 3, 1762 Louis XV ceded the entire Province of Louisiana to the King of Spain by the Treaty of Fontainebleau. Subsequently, on October 1, 1800 Spain transferred the Territory to France by Treaty of St. Ildefonso, to be delivered on October 18, 1802. The United States acquired the territory from France by the Treaty of Cession on April 30, 1803, and on that date the title to the entire Louisiana Territory so purchased vested in the United States.
During the year 1785 the Continental Congress adopted an ordinance which reserved and set aside the 16th Section of every township for the public schools within the said township. (1 Stat. § 563).
The Constitution of the United States was adopted in 1789 and Article IV, Sec. 3, Clause 2 thereof provides as follows:
"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State."
On May 18, 1796 Congress adopted an Act (1 Stat. 464, Ch. 29, now 43 U.S.C.A. § 751) which provides for the rectangular system of surveying. The Act provides that each township shall be six miles square, subdivided into thirty-six sections, each one mile square. The sections are to be numbered respectively, beginning with No. 1 in the northeast corner, and proceeding west and east alternatively, through the township with progressive numbers, until thirty-six sections are surveyed.
By Acts of Congress on April 21, 1806 (2 Stat. 391, Ch. 39, Sec. 11) and March 3, 1811 (2 Stat. 662, 665, Ch. 46, Sec. 10), the President of the United States was authorized to sell certain lands in the Territory of Orleans (now the State of Louisiana), however these statutes expressly excluded sections numbered 16 which was reserved for the support of schools. These said Acts provided that:
"* * * All such lands (public lands lying in the Territory of Louisiana) shall, with the exception of the Section `number sixteen' which shall be reserved in each township for support of schools within the same * * * be offered for sale to the highest bidder * * *"
The wording of these Acts declares that every 16th Section is reserved for the schools within same, and the petitioners contend that such wording includes all property situated within the boundary of such sections whether underlying navigable waters or not. As the schools of the entire Parish of Terrebonne are owned and operated by the Public School System of said Parish, under the administration of the Terrebonne Parish School Board, it is clear that the schools within said township, if any, are under the control and administration of the School Board, and that the Public School System of Terrebonne Parish is synonymous with the schools of the township.
*432 Louisiana was the first State formed out of the Louisiana Purchase and was admitted into the Union by virtue of the Acts of February 20, 1811 (2 Stat. 641, Ch. 21); April 8, 1812 (2 Stat. 701, Ch. 50); April 14, 1812 (2 Stat. 708, Ch. 57).
The record discloses that Rightor and McCollam, official government surveyors, did survey a portion of Township 21, South, Range 14 East during the winter and spring of the year 1838. This Township map was approved by the Surveyor General of Louisiana on December 8, 1842. This map shows that the southern boundary and a portion of the eastern boundary of Section 15 was surveyed in place. None of the boundaries of Section 16 were so surveyed, however, the southeastern corner thereof was located.
By protraction, which was authorized later, the official government survey now shows Section 16 as containing the full 640 acres of a regular section.
On April 23, 1912 the Congress of the United States enacted the Louisiana Protraction Statute (37 Stat. 90), which Act declares as follows:
"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled. That all the unsurveyed lands in the State of Louisiana which are shown by official protraction of the government surveys heretofore made to be embraced within sections numbered sixteen and which lie in the same township as land which have been certified or patented in that State under the Act approved March second, eighteen hundred and forty-nine, entitled `An Act to aid the State of Louisiana in draining swamp lands therein', and the Act approved September twenty-eight, eighteen hundred and fifty, entitled `An Act to enable the State of Arkansas and other States to reclaim swamp lands within their limits' to be, and the same are hereby, fixed, reserved, and confirmed to that State for the benefit of public schools as though the official surveys had been regularly extended over such townships."
Defendants contend that the phrase "sixteenth section and school indemnity lands" refers only to high lands situated in such section, and excludes the beds of all navigable bodies of water situated in such sections. In support of their position they cited Article IV Section 2 of the Louisiana Constitution of 1921, as amended, which provides:
"Section 2. The Legislature shall have no power to contract or to authorize the contracting of any debt or liability on behalf of the State; or to issue bonds or other evidence of indebtedness thereof, except for the purpose of repelling invasion, or for the suppression of insurrection. Nor shall the Legislature alienate, or authorize the alienation of, the fee of the bed of any navigable stream, lake or other body of water, except for the purposes of reclamation. In all cases the mineral rights on any and all property sold by the State shall be reserved, except where the owner or other person having the right to redeem may buy or redeem property sold or adjudicated to the State for taxes. This, however, shall not prevent the leasing of such lands and rights for mineral or other purposes * * *."
Appellant sets out the following specifications of error:
"(1) In failing to decide that Mud Hole Bay and Mud Hole Bayou were navigable when the State was admitted into the Union, having remained so since that time, and have vested in the State in its sovereign capacity free of any reservation of lands for the benefit of public schools.
(2) In deciding that the Terrebonne Parish School Board was empowered to lease the water bottoms in dispute under the provisions of the State *433 Agency Leasing Act even if title thereto was vested in the State by virtue of its inherent sovereignty and in a proprietary capacity.
(3) In assuming that Mud Hole Bay and Mud Hole Bayou form part of Section 16, T-21-S, R-14-E, even though navigable when Louisiana was admitted to statehood.
(4) In failing to pass upon and overrule the pleas of estoppel."
We will take up the question of navigability of Mud Hole Bay and Mud Hole Bayou first. The Trial Judge held that it didn't matter whether Mud Hole Bay was navigable or not. The Terrebonne Parish School Board had the power to lease or to lease that portion which would be a part of Section 16 as projected.
Almost the entire record is made up of testimony concerning the navigability of Mud Hole Bay. There is lay testimony that as far back as the memory of man will permit water bodies here involved have been navigable.
Winfield Dehart, who was 71 years of age, testified that he had fished oysters and shrimp in Mud Hole Bay since he was 10 or 11 years old. He fished oysters until about 1925 and since that time had been engaged in shrimping. He testified that as long as he could remember the Bay had been used for all types of commercial fishing. In the early days oysters were fished in sailboats, twenty-eight to thirty feet long and the vessels had drafts or two and one-half feet and load capacity of about 45 barrels of oysters. Later power boats of the same type with flat and round bottoms were used. He further testified that Mud Hole Bay had not changed since he first knew it. He said it had a depth of three to five feet under normal conditions and average drop in tide of one to one and a half feet. He also testified that Mud Hole Bay was connected with the Gulf of Mexico through Mud Hole Bayou, Cross Bayou and Taylor's Bayou.
Ulysse Plessala, who was 86 years old testified he had been engaged in commercial fishing of oysters in Mud Hole Bay since he was 16 years old. At that time there were around twenty oyster fishermen operating in the Bay and the boats used were sailing boats forty to fifty feet long. Afterwards power boats were used. He also testified that Mud Hole Bay has a depth of five and a half to six feet and fall of tide from one to one and a half feet. He further testified that Mud Hole Bay was connected by natural bayous to the Gulf of Mexico and that one of these bayous, Cross Bayou, had a depth of twenty feet.
Arthur A. Pierron, 71 years old, testified he had been a commercial oyster fisherman since he was 16 years old. In the beginning sailboats were used and that the one he operated measured 40 × 12 feet. Beginning about 1908 power boats of approximately the same size were used. Sailboats had drafts of 24 inches and the power boats 32 inches and there were about fifty oyster fishermen working in Mud Hole Bay, marketing their oysters at a market at Taylor Bayou. He further testified that oyster buyers would come to buy oysters and travel in motor boats bearing 100 to 150 barrels of oysters, would pass through Mud Hole Bay most of the time. He further testified that during the prohibition era men hauled moonshine whiskey through Mud Hole Bay in big power boats, drawing five feet of water and that Mud Hole Bay has always been subject to the rise and fall of the tide. He corroborated the other witnesses in that boats traveled from Mud Hole Bay to the Gulf by connecting natural bayous.
Clifford Smith, a Civil Engineer, testified that he had gone on Mud Hole Bay for a period of about ten years, using all types of outboards ranging from 12 feet to 16 feet and 18 feet with motor horsepower from 5 to 75. On one occasion he crossed the Bay on a small barge and that he had been all over the Bay in a 40 foot boat. He corroborated the other witnesses in his testimony that Mud Hole Bay is connected with the Gulf of Mexico with natural bayous *434 and channels and is subject to the ebb and flow of the tide. They all testified that during the winter months season, the water level of Mud Hole Bay was lowered by the action of brisk north wind and this produces some difficulty in navigating certain portions of the Bay, which was typical of all bays in the coastal areas of the State.
In addition the defendant placed three expert scientists on the witness stand, namely, Dr. Harold Anderson, an expert in Micro-Paleontologist and an Ecologist, who had made extensive studies in micro-organisms, associated with delta building in Louisiana. Dr. Frank Welder, an expert in Geology and Geomorphology, who is known for his studies in delta building processes and a history of Louisiana deltas. Dr. Allen Walton, an expert geochemist, with particular experience in the use of Carbon 14 dating methods.
In addition there were several photographs of boats offered in evidence showing them being operated on Mud Hole Bay.
Without going into the detail of the testimony of these three scientists, the sum and substance of their testimony is that Mud Hole Bay was in existence and Mud Hole Bayou in existence and substantially in their present form before the admission of the State to the Union.
Plaintiffs contend that during the winter months there were shallows created in certain portions of the Bay during the winter season by the action of strong north winds. Our Courts and the United States Supreme Courts have repeatedly held that bodies of water are navigable despite of the impediments to navigation by natural obstructions such as falls, rapids, drafts, shifting sand bars and so forth.
The leading case on this point is United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465, held as follows:
"In seasons of great drought there was difficulty in getting boats up the river and through the lake; but this was exceptional, the usual conditions being as just stated. Sand bars in some parts of the lake prevented boats from moving readily all over it, but the bars could be avoided by keeping the boats in the deeper parts or channels. Some years after the lake was meandered, vegetation such as grows in water got a footing in the lake, and gradually came to impede the movement of boats at the end of each growing season, but offered little interference at other times. Gasoline motor boats were used in surveying and marking the line of the intended ditch through the lake and the ditch was excavated with floating dredges.
Our conclusion is that the evidence requires a finding that the lake was navigable within the approved rule before stated."
See also United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844; United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243; Goodwill v. Police Jury of Bossier Parish, 38 La.Ann. 752; D'Albora v. Garcia, La. App., 144 So.2d 911; State ex rel. Board of Com'rs of Atchafalaya v. Capdeville, 146 La. 94, 83 So. 421; State v. Jefferson Island Salt Mining Company, Incorporated, 183 La. 304, 163 So. 145. In the case State v. Jefferson Island Salt Mining Company, supra, the Court held as follows:
"Having determined the navigability of the Lake itself, I am forced to likewise conclude from the historical records, and from the testimony of the inhabitants, though they be at variance with each other in some respects, that the outlet which I have termed Bayou Carlin contained a channel in the marsh of sufficient depth to afford communication, in small boats, with Vermillion Bay. It is admitted that the channel of that Bayou ran up to the marsh. Evidence has been offered to show that sixty years ago, a channel was made through the marsh by the inhabitants, *435 through the cutting of weeds and the driving of cattle for a distance of one and three-quarters miles. It is likewise shown that this marsh periodically contained water, though at other times going dry. However, in spite of these facts, there can be no doubt in my mind that this Bayou, even though its channel in the marsh was of a very limited nature, in its service, was sufficient for purposes of communication."
The plaintiffs rely on a case of Olin Gas Transmission Corporation v. Harrison, La. App., 132 So.2d 721. This Court held that Round Lake was not a navigable body of water. However, that case is differentiated from this case because the Courts found that the lake was a landlocked fresh water lake until opened recently by artificial cuts made by trappers and hunters. The lake was never used commercially and would not come under the qualifications for a navigable body of water.
All the evidence submitted by the defendant is in the record uncontroverted. Plaintiffs rely on an old survey made by Rightor and McCollam. This survey sets out Sections 15 and 16, T 21, S, R 14 E. The surveyor lists the land in Sections 15 and 16 as low, worthless marsh. This survey was made in 1838. However, the field notes show that the surveyor never attempted to survey this land. He went to the southwest corner of Section 15, which is the southeast corner of Section 16 and then proceeded down the line between Sections 21 and 22 to Bayou Delage. He put an iron stake at the corner common to Sections 21, 22, 27 and 28 but he definitely did not go on Section 16 at all. Actually Section 16 has never been surveyed. After the Act of 1912 (Protraction Act of 1912, 37 Stat. 90) swamp lands in 16 sections were reserved to the State. However, this is one hundred years after the admission of Louisiana to the Union. The title of the State to the navigable waters under the inherent sovereignty of the State had already passed to Louisiana.
The case of United States v. State of Wyoming, 331 U.S. 440, 67 S.Ct. 1319, 91 L.Ed. 1590, held as follows:
"Under Wyoming enabling act providing that Sections Nos. 16 and 36 in each township are hereby granted to the State for support of common schools, title to unsurveyed school land passes to State only at date of survey and then only where Federal Government has made no other disposition of land prior to that time.
Defendants vigorously assert that the phrase `but shall be received for school purposes only' completely and irrevocably divested the Federal Government of power to dispose of or to deal with any Sections 16 and 36 of the public lands in the State not sold or otherwise disposed of prior to the passage of the Enabling Act. This phrase read in connection with the language of the present grant in Paragraph 4, it is asserted, reveals a clear intention to vest immediately in the State an indefeasible interest in all such lands. We do not believe that the language should be so construed."

You will note that this decision rejects the contention that the school lands were completely and irrevocably divested from the Federal Government. Title to the school lands does not pass from the Federal Government until after a survey has been made and approved. There had been no survey made of this 16th section and in the meantime by virtue of it being navigable the title to the bed of Mud Hole Bay and Mud Hole Bayou passed to the State of Louisiana.
The case of Pollard v. Hagan, 3 How. 212, 11 L.Ed. 565 in the syllabus held as follows:
"1. When Alabama was admitted into the Union it became entitled to soil under navigable waters, same as original states, nothing therein remained to the United States but *436 the public lands. These do not include lands below high water in navigable streams.
2. The shores of navigable waters and the soils under them were not granted by the Constitution to the United States but were reserved to the States respectively.
3. The new States have the same rights, sovereignty and jurisdiction over this subject as the original States."
Our Courts have repeatedly held that rivers or bodies of water, which are navigable in fact are navigable in law. The case of United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844, held as follows:
"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water (quoting from The Daniel Ball, 10 Wall. 557, 563, 19 L.Ed. 999, 1001)."
Counsel for plaintiff urges and the Lower Court so held that school sections included navigable water bodies.
They cite the case of Jones v. Soulard, 65 U.S. 41, 16 L.Ed. 604; Board of Directors of Public Schools of Parish of New Orleans v. New Orleans Land Company, 138 La. 32, 70 So. 27. They contend that the Soulard case squarely holds that a navigable water bottom, namely the Mississippi River, was included in a school grant. However, reading this case shows that the only area in dispute was the sand bar attached to the adjoining shore and the only issue involved was whether it enured to the riparian owners.
The New Orleans Land Company case did not involve right to the navigable water bottom. In that case Bayou St. John ran through the township but it did not border on Section 16.
Plaintiffs also contend that in as much as the State selected certain sections of Louisiana as indemnity lands for lands that they did not get, including Section 16 and the United States approved of all of them except Section 16, stating that it was reserved for public schools recognizes that Section 16 belongs to the school board.
For the reason heretofore stated herein the title of 16 sections had not passed to the school board because there had been no actual survey at that time even by protraction. It is admitted that certain portions of Section 16 do belong to the school board because the high land portions is not in dispute in this case. Until there was a survey and the acreage fixed, the title to the 16th Section was still in the Federal Government. However, to determine the acreage of the high land and the acreage of the swamp lands or water bottoms it would be necessary that a survey be made before any claims for indemnity land for this section could be allowed.
We next come to the second specification of error, namely, that the Terrebonne Parish School Board was empowered to lease the water bottoms in dispute under the provisions of the State Agency Leasing Act even though the title thereto was vested in the State by virtue of its inherent sovereignty. We fail to agree with our Learned Brother below in this holding, and there is no doubt that under Revised Statutes 30:152 does read as follows:
"Every agency is authorized to lease its land for the development and production of minerals. School boards are authorized to lease sixteenth section and school indemnity lands for the development and production of minerals."
Plaintiff contends that under LSA-RS 30:152 the school boards are authorized to lease 16th section and school indemnity lands for the development and production *437 of minerals without qualification or reservation and that it does not except navigable water bottoms. They cite State v. Humble Oil Company, 195 La. 457, 197 So. 140, which holds as follows:
"* * * If it were the intention of the legislature that sixteenth section lands, which were under the jurisdiction of the school authorities, should be amenable to the provisions of the act, it would have been a simple matter for the legislature to also mention those lands in the statutory provisions. The legislature did not do this. No mention of the sixteenth section lands is made anywhere in the legislative act. The omission is significant and can not lead the earnest inquirer to any other conclusion than that the omission was intentional and that it was never within the contemplation of the legislature to divest the school boards of their control and administration of the sixteenth section lands."
This act gives the school board the right to lease sixteenth section or school indemnity land but it does not give the school board the right to lease beds of navigable waters. In view of our holding that this is navigable water, they do not come under the provision of this act.
Plaintiffs then urge that in as much as the State Mineral Board approved the lease between the plaintiffs they are now estopped from asserting title to it. The Resolution approving the mineral lease from Terrebonne School Board provides as follows:
"This resolution is adopted with the understanding that the approval of the mineral lease aforesaid has been made on the sole basis of the requirements of statute, express or implied, governing the action of this Board in considering State Agency leases, and that the source and nature of lessor's title has not been inquired into or considered in connection with the action taken by this Board in approving the lease."
This was a qualified approval and had no bearing upon the title to the land or the water bottom in dispute.
The State of Louisiana filed Exception of no Right or Cause of Action based on the fact that the lease was not signed and was therefore "Nudum Pactum" for lack of mutality. In view of our findings herein, we feel it is not necessary to discuss this matter.
For the foregoing reasons it is ordered that the judgment of the Lower Court be reversed and judgment rendered in favor of the defendant and against the plaintiffs decreeing and disallowing all of the claims and demands of plaintiffs in this matter and recognizing and decreeing that title to that part of the beds and bottoms of Mud Hole Bay and Mud Hole Bayou, involved herein is owned and held by the State of Louisiana by virtue of its sovereignty and in a proprietary rights and not for the benefit of the schools. Further decreeing plaintiffs have no right, title or interest in and to beds of said waters and no part thereof is subject to oil, gas and mineral leases by the Terrebonne Parish School Board as lessor in favor of Robert B. Prentice and M. H. Marr, dated January 10, 1953 but that the portions of the beds of said waters lying within the outlines of Tract 586 described in Oil, Gas and Mineral Lease granted by the State Mineral Board to the Union Oil Company of California on March 25, 1946 is subject to said lease, which is now held by Texaco, Incorporated, and that all costs in this matter be borne by the plaintiffs.
Reversed and rendered.